In re ACME SECURITY, INC., Debtor.

Acme Security, Inc., Movant/Objector,

v.

CLN Properties, LLC, Claimant.

No. 12–57103–PWB.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Dec. 11, 2012.

Edward F. Danowitz, Jr., Karen L. Kropp, Danowitz & Associates, P.C., Atlanta, GA, for Debtor.

David S. Weidenbaum, Office of the U.S. Trustee, Atlanta, GA.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PAUL W. BONAPFEL, Bankruptcy Judge.

### I. Introduction

This contested matter involves questions of successor liability under Georgia law when one corporation acquires the assets of another corporation, both controlled by the same principal, through exercise of its rights as a secured creditor under the Uniform Commercial Code. The Court concludes that successor liability does not apply in the circumstances here.

The chapter 11 debtor in this case, Acme Security, Inc., purchased the secured claim of a bank in the previous chapter 11 case of ALK Holdings, Inc ("ALK"). Michael Hassebrock and his wife were the sole shareholders of ALK, while Mr. Hassebrock is the sole shareholder of Acme Security.

The bank's claim of approximately $380,000 was secured by substantially all of ALK's assets, worth about $200,000. After dismissal of ALK's chapter 11 case, Acme Security and ALK agreed that Acme Security would accept all of ALK's assets in full satisfaction of the claim, as O.C.G.A. § 11–9–620 permits. Thereafter, Acme Security engaged in the same business as ALK in the same location with the same assets, employees, and customers.

CLN Properties, LLC ("CLN"), filed a proof of claim in the current case in which it asserts that Acme Security is liable to it in the amount of $465,640.20 as a successor to ALK for ALK's obligations as the tenant under a lease.[1] Acme Security has objected to the claim on the grounds that it is not a successor to ALK and that in any event CLN is not entitled to the amount it claims.[2]

The Court conducted an evidentiary hearing on October 2, 2012, at which both parties presented testimony and documentary evidence.[3] The evidence at the hearing and the arguments of counsel present two issues.

The first issue is whether Acme Security is liable to CLN on a theory of successor liability. If it is, the second question is the amount of its claim.[4]

---

1. Proof of Claim No. 11.

2. Docket No. 27.

3. Acme Security's exhibits are marked with an "M" (for Movant) and CLN's exhibits are marked with a "C" (for Claimant).

4. Acme Security's objection [Docket No. 27] does not question the amount of CLN's claim, but it is clear from the hearing and prior proceedings in the case that the issue is before the Court.

The Supreme Court of Georgia summarized the law of successor liability in Georgia in *Bullington v. Union Tool Corp.*, 254 Ga. 283, 284, 328 S.E.2d 726 (1985) (citations omitted), as follows:

> Generally, a purchasing corporation does not assume the liabilities of the seller unless: (1) there is an agreement to assume liabilities; (2) the transaction is, in fact, a merger; (3) the transaction is a fraudulent attempt to avoid liabilities; or (4) the purchaser is a mere continuation of the predecessor corporation.

CLN asserts the third and fourth exceptions as the grounds for Acme Security's successor liability. Thus, CLN contends that Acme Security either acquired the assets of ALK in a fraudulent attempt to avoid ALK's liabilities or that Acme Security is a "mere continuation" of ALK.[5]

For reasons set forth below, the Court concludes that Acme Security is not liable to CLN as a successor to ALK. Accordingly, it is not necessary to determine the amount owed.[6]

---

**5.** CLN's theories differ somewhat from those asserted in the prepetition State Court complaint it filed in the State Court against Acme Security (Ex. M–18) and in its response to the objection filed by Acme Security [Docket No. 33].

In the complaint, CLN asserted that Acme Security was liable to CLN on the lease for three reasons. First, CLN asserted that, if Acme Security "purchased all debts and liabilities of [ALK] at fair market value, then it acquired the debt owed to [CLN]." (Ex. M–18 at ¶ 40).

Second, CLN asserted that, if Acme Security did not purchase all of ALK's assets, including intangible assets, for fair market value, its continuing to do business as Acme Security demonstrated that Acme Security was a mere alter ego of ALK, not entitled to protection as a separate legal entity. (*Id.* at ¶ 45). In support of its alter ego theory, CLN also claimed that ALK and Acme Security were mere instrumentalities or alter egos of Mr. Hassebrock and that Mr. Hassebrock had ignored the corporate form and created and used ALK and Acme Security to avoid legitimate debts. (*Id.* at ¶¶ 47–48).

Third, CLN contended that, if Acme Security did not pay fair market value for all assets transferred, then the transfer of assets to Acme Security was a transfer to an insider for the purposes of avoiding debt that was a fraudulent transfer. (*Id.* at ¶ 51–52).

In its response to Acme Security's objection, CLN generally incorporated the theories of its complaint.

Neither CLN's complaint nor its response advances a theory of successor liability. Nevertheless, it is clear from the hearing, the evidence presented, and the arguments of counsel, that the question of successor liability as stated in the text is the issue that the parties have tried and that is properly before the Court. See Fed.R.Civ.P. 15(b)(2), *applicable under* Fed. R. Bankr.P. 7015.

To the extent that CLN has not abandoned the theories of liability asserted in its State Court complaint, the Court concludes that the evidence does not support them. As matters of fact, the Court finds that Acme Security paid more than fair market value for the assets and that it did not "purchase," or otherwise agree to assume, ALK's debts. Further, the evidence does not establish that Mr. Hassebrock or Acme Security ignored corporate formalities or otherwise engaged in the transactions at issue in a fraudulent or otherwise improper attempt to avoid legitimate debts. As the Court discusses in Part III(A), CLN and other creditors of ALK would have had no possibility of any recovery on their debts against ALK if the transaction had not occurred and, instead, Acme Security had repossessed and liquidated ALK's assets. Nothing indicates that Mr. Hassebrock was not entitled to acquire the claim and collateral of the bank and exercise the same remedies that the bank could have asserted if it had retained the claim.

**6.** At the hearing on October 2, the Court determined that it would first address the issue of Acme Security's liability, reserving the question of the amount of the claim for further proceedings if CLN prevailed on that issue. Because the Court at the hearing ruled that Acme Security is not liable as a successor, the parties did not produce any evidence with regard to the amount of CLN's claim.

Acme Security's objection to CLN's proof of claim is a core proceeding as described in 28 U.S.C. § 157(b)(2)(B) over which the District Court has jurisdiction pursuant to 28 U.S.C. § 1334(b) and that has been referred to this bankruptcy judge pursuant to 28 U.S.C. § 157(a) and Local Rule 83.7, N.D. Ga. This Court has authority to enter a final judgment with regard to the objection pursuant to 28 U.S.C. § 157(b)(1), subject to review under 28 U.S.C. § 158.

Pursuant to Fed.R.Civ.P. 52(a), *applicable under* Fed. R. Bankr.P. 7052, *applicable under* Fed. R. Bankr.P. 9014, the Court makes the following findings of fact and conclusions of law.[7]

## II. Findings of Fact

The testimony and exhibits introduced into evidence[8] do not raise any material disputes with regard to what happened.

In July 2003, Michael Hassebrock formed ALK Holdings, Inc. ("ALK"), to acquire the assets of a business known as Acme Lock & Key from its retiring owners. Mr. Hassebrock and his wife were the only shareholders, officers, and directors of ALK.

To finance its purchase of the assets, ALK borrowed approximately $550,000 from Chattahoochee National Bank. ALK granted the bank a security interest in substantially all of its then existing or after-acquired assets (Ex. M–5),[9] and Mr. Hassebrock personally guaranteed the debt. RBC Centura Bank ("the "Bank") eventually became the holder of the note and security interest.

By 2006, ALK had developed a substantial business providing lock-work for Wachovia Bank that required more space than it had at its location on 1021 White Street in Atlanta, Georgia. Accordingly, in August 2006 ALK signed a 74–month lease with CLN Properties, LLC ("CLN") for 9,544 square feet of office space at 4895 South Atlanta Road, Suites C & D, in Smyrna, Georgia, with occupancy to begin on November 1, 2006 and end on December 31, 2012. (Ex. C–1).

At the time of execution of the lease, Wachovia was ALK's largest customer, providing approximately 70 to 75 percent of its business revenues. After ALK moved into the Smyrna premises, however,

---

7. The Court announced findings of fact and conclusions of law on the record at the conclusion of the hearing held on October 2. Following the hearing, the Court determined that it should give further consideration to the factual and legal issues that the evidence raises and invited the parties to submit authorities in support of their positions, which have been made a part of the record. [Docket Nos. 49 and 50]. Accordingly, the Court's findings and conclusions set forth herein supplement and supercede the findings and conclusions made at the hearing to the extent that they are inconsistent.

8. Acme Security's exhibits are marked with an "M" (for Movant), and CLN's exhibits are marked with a "C" (for Claimant).

9. Exhibit M–5 is a copy of a motion for relief from the stay filed by the holder of the loan in

ALK's chapter 11 case in this Court, No. 08–60966–MGD, Docket No. 43. The loan documents are attached to the motion.

The security interest included equipment and machinery, furniture, and fixtures, then owned or thereafter acquired; inventory, raw materials, work in process and supplies then owned or thereafter acquired; all accounts receivable then outstanding or thereafter arising; and all accounts, franchise rights, trade names, license agreements, contract rights, choses in action, instruments, chattel paper, documents, money, investment property and general tangibles then in force or thereafter acquired, except for the trade name "Acme Lock & Key" and the telephone number, 404–755–5726. Security Agreement, Exhibit B to Ex. M–5 at 8, and UCC Financing Statement, Exhibit C to Ex. M–5 at 35. Nothing in the evidence indicates that the trade name or telephone number had any significant value.

Wachovia Bank significantly reduced the lock business that it sent to ALK and began disbursing the work to other contractors. ALK responded to the substantial decline in its revenues by attempting to reduce costs and laying off personnel. In addition, ALK sought to renegotiate its lease with CLN because it no longer needed all of the leased space and its reduced revenues could not support payment of rent at the contractual amount.

Negotiations between ALK and CLN with regard to modification of the lease were unsuccessful. On January 9, 2008, CLN made demand on ALK to pay past due rent of $30,283.01 and accelerated rent of $ 435,357.19 within ten days and to vacate the premises on the eleventh day if it did not pay these amounts. (Ex. C–2). On January 22, 2008, ALK filed a chapter 11 bankruptcy case in this Court, No. 08–60966–MGD (Ex. M–1).[10] CLN filed a proof of claim in the ALK case on February 23, 2008, for the rent it had asserted, $465,640.20. (Ex. M–9).

On February 19, 2008, ALK filed a motion in its chapter 11 case to sell all of its assets to Acme Security, Inc., whose sole shareholder is Mr. Hassebrock,[11] for $378,591.18, the amount then owed to the Bank. (Ex. C–3). The motion represented that the orderly liquidation value of the assets was only $200,270. Because the Bank would receive all of the sales proceeds from the sale of its collateral, the proposed sale would not have resulted in any money for the benefit of other creditors, who would have received no payment in the case. ALK solicited third-party offers for its assets, but received none.

The court in the ALK case declined to approve the proposed sale. In the course of the proceedings, however, an examiner was appointed to investigate the value of ALK's assets. At a hearing in the ALK case held on April 1, 2008, the examiner, Richard Elrod, an experienced auctioneer frequently employed by trustees in this district to liquidate business assets, reported his conclusion that the value of the assets was approximately $200,000, as ALK had represented.[12]

While the motion to sell its assets was pending, ALK rejected its lease with CLN, effective April 30, 2008, (Ex. M–3), and the Bank on April 17, 2008, filed a motion for

---

**10.** The ALK case was assigned to Judge Diehl.

**11.** Mr. Hassebrock testified that he was the sole shareholder of Acme Security, which is what the sale motion states. (Ex. C–3 at ¶ 5). Acme Security's tax return for 2009, however, shows that he owned 50 percent of the stock and that his wife, Donna Hassebrock, owned 50 percent. (Ex. C–7 at 5, 8). As the Court discusses later in its conclusions of law in Part III(B), whether Ms. Hassebrock was also a shareholder in Acme Security is immaterial.

**12.** The court in the ALK case held a hearing on June 12, 2008, on the motion of the United States Trustee to accept the Examiner's Report made orally at a hearing on April 1, 2008, and entered an Order granting the motion. (Ex. M–4).

ALK's schedules reflect that it had about $60,000 of accounts receivable at the time of filing and approximately $18,000 in cash and cash equivalents. See ALK's Schedule B, Case No. 08–60966, Docket No. 9 at 15–16. It is not clear whether the Examiner's oral report of the liquidation value of ALK's assets at $200,000 took these assets into account. The appraisal attached to ALK's motion to sell assets (Ex. C–3) does not seek to value ALK's accounts receivable or other assets.

The evidence does not address this issue. On the dubious assumption that all accounts receivable of a financially distressed debtor could be collected in full, the total value of ALK's assets if the $200,000 valuation did not include cash and accounts receivable would have been approximately $278,000, still substantially less than the debt that encumbered them. In view of the substantial deficiency even if the values of these additional assets are taken into account, their actual value is immaterial.

relief from the stay to liquidate its collateral. (Ex. M–5). ALK moved into new space at 4451 Atlanta Road, Suite 136, Smyrna, Georgia, leased from VPBP, LLC, on April 21, 2008. ALK left the premises leased from CLN. (Ex. M–16).

On May 2, 2008, the Bank assigned its note and security interest to Acme Security for $ 392,248.65 (Ex. M–6), and the Bank's claim in the ALK case was assigned to Acme Security. (Ex. M–7, M–8). Acme Security acquired the funds to pay the Bank from Mr. Hassebrock and granted him a security interest in all of its assets to secure the loan. (Ex. M–12).[13] After acquiring the loan and security interest, Acme Security did not pursue the motion for relief from the automatic stay and did not seek to exercise any of its remedies during the pendency of ALK's chapter 11 case.

Over the next 11 months following Acme Security's acquisition of the Bank's claim, ALK remained in bankruptcy. ALK had a cash flow that permitted it to pay its operating expenses and nothing more. In particular, it did not make any payments on its secured debt to Acme Security.

On April 6, 2009, the United States Trustee filed a motion to dismiss ALK's chapter 11 case or to convert it to chapter 7. (M–10). The motion represented that ALK's operating reports for December 2008 through February 2009 showed an average monthly positive cash flow of only $132.66, "woefully insufficient to satisfy administrative expense claims and make a meaningful distribution to creditors." (*Id.* at ¶ 7). The motion further asserted that ALK had no apparent ability to consistently generate sufficient cash flow post-petition and that it did not appear that ALK had the ability to formulate a plan of reor-

ganization that could be confirmed. (*Id.* at ¶¶ 8, 10).

The court in the ALK case conducted a hearing on the United States Trustee's motion to dismiss or convert, which CLN attended. On May 13, 2009, the court dismissed ALK's case, without opposition from any party in interest. (Ex. M–11).

At the time of dismissal of ALK's chapter 11 case, ALK had assets worth substantially less than the debt that encumbered them. Its lack of positive cash flow meant that it could not generate profits for any owner of the business, much less make payments on its secured or unsecured debts. It had no realistic prospects of continuing its operations and remaining in business.

Given these financial circumstances, it is clear that CLN and the other unsecured creditors of ALK had no prospect whatsoever of collecting any money from ALK. In view of the ALK court's decision to dismiss ALK's case rather than convert it, this is not at all surprising. If anyone had thought that the liquidation of ALK's assets in a Chapter 7 case and the administration of its estate would have produced some benefit for unsecured creditors, the court would quite obviously have converted the case instead of dismissing it.

Acme Security, as the holder of the debt secured by ALK's assets, had the right to repossess ALK's assets and sell them at a commercially reasonable sale, collect any accounts receivable owed to ALK, and apply the proceeds after expenses of doing so to the debt. See O.C.G.A. § 11–9–610. Had this occurred, it is certain that Acme Security would have received no more than $200,000 on its debt and that ALK would still owe a deficiency claim to Acme Securi-

---

13. It appears that the UCC Financing Statement required to perfect Mr. Hassebrock's security interest was not filed until August 23, 2010. (Ex. M–12 at 14).

ty of at least $190,000.[14] See O.C.G.A. § 11–9–615. ALK would have been left with no assets to satisfy claims of CLN or any other creditors and, obviously, no business operations either.

Acme Security did not seek to liquidate its collateral through repossession and sale. Instead, on May 23, 2009, it agreed with ALK to accept the collateral in full satisfaction of the debt, as O.C.G.A. § 11–9–620 permits. (Ex. M–13). From the standpoint of CLN and other unsecured creditors of ALK, this form of disposition of the assets of ALK had the same consequence as the secured lender's repossession and sale of the assets under other provisions of Georgia's Uniform Commercial Code, except that the transaction eliminated any potential deficiency claim against ALK.

When it accepted ALK's assets in full satisfaction of its secured claim against ALK, Mr. Hassebrock testified, Acme Security had been engaged in separate lines of business in which ALK was not engaged. Specifically, he testified, ALK was engaged in the lock and key business, whereas Acme Security was engaged in the electronic security business, including

alarms, card reading and surveillance, which requires licensing. The evidence also shows that Acme Security maintained an account at SunTrust Bank for September through November 2008. (Ex. C–4, C–5, and C–6).[15] The statements show deposits of about $12,400 during the period and an ending balance of less than $2,100.

Mr. Hassebrock testified that in 2008 Acme Security did not have office or other business space and had no employees, vehicles, equipment, computers, a telephone number, or any assets other than cash. Mr. Hassebrock provided services for the work Acme Security performed, using a cell phone that ALK paid for. ALK generally permitted employees to use company cell phones for personal business.

Although it thus appears that Acme Security conducted an electronic security business prior to its acquisition of ALK's assets on May 23, 2009, Acme Security filed a federal income tax return for 2009 stating that it was incorporated and began business on May 24, 2009. (Ex. C–7).

The evidence summarized in the three preceding paragraphs raises potential questions as to whether Acme Security

14. About a year earlier, the secured debt owed to the Bank was approximately $392,000, as evidenced by the purchase price paid for it, and the undisputed liquidation value of the collateral a year earlier was not more than $200,200 in the context of an orderly sale. The debt increased during the period because interest continued to accrue, and the secured creditor would have to pay expenses of liquidating the collateral, so the unsecured deficiency claim almost certainly would have exceeded $190,000 and in all likelihood would have been substantially more.

As note 9 observes, these numbers do not take into account any value of ALK's accounts receivable and cash equivalents. The evidence the parties produced at the hearing does not address these items. It is possible, although not likely, that these additional as-

sets might have produced as much as an additional $78,000 to be applied to the debt. Assuming that this could have occurred, the deficiency would have been only $112,000.

Regardless, it is clear that other creditors would have received nothing from a liquidation sale.

15. Each exhibit includes an account reconciliation with a header that states it is for ALK Holdings Inc., and for SunTrust checking. The statement for September (Ex. C–3) does not show the name of the account holder, the exhibit for October (Ex. C–4) does not include a bank statement, and the exhibit for November (Ex. C–5) shows the name of the account holder as "Acme Security, Inc.", with a Cumberland Parkway address. The Court finds that all of the statements are for Acme Security's bank account.

properly filed tax returns with regard to its business operations in 2008 and in 2009 prior to May 24, 2009, and as to whether Acme Security may have improperly used assets of ALK in the course of operating Acme Security's business during this period. But it is undisputed that Acme Security had been engaged in business operations that differed from those of ALK prior to the acquisition of ALK's assets.

Specifically, the Court finds that Acme Security was engaged in the provision of electronic security services through Mr. Hassebrock and that ALK was not engaged in this line of business.

After Acme Security acquired ALK's assets, Acme Security commenced the operation of the lock and key business utilizing those assets. In addition, Acme Security continued the operation of its existing electronic security business, in which ALK had not been engaged and in which it could not have engaged because it did not have the required license.

Acme Security intended to, and did, conduct the business as a separate entity from ALK. In this regard, it accounted for all transactions as its own, as its 2009 tax return reflects. (Ex. C–7). It utilized its own checking account for its transactions. (Ex. M–17). Further, it advised its customers and vendors that it had purchased the assets of ALK, that they would be doing business with Acme Security going forward, that checks should be made payable to Acme Security, and that they should use Acme Security's federal employer identification number on W–9 forms. (Ex. M–14).

Although Acme Security was operating the business as a separate entity from ALK, it apparently used some of ALK's invoices and purchase orders for a short time after the acquisition. (Ex. C–20, C–21, C–22).[16] It also initially maintained insurance in the name of ALK and paid a premium billed to ALK for the period beginning July 8, 2009. (Ex. C–12).

Acme Security continued to operate in the premises that ALK had leased from VPBP, LLC, on April 21, 2008. (Ex. M–16). As extended through four amendments, the last of which ALK executed on April 17, 2009 (prior to dismissal of ALK's chapter 11 case), the term of this lease expired on June 30, 2009. (Ex. M–16).

Acme Security itself executed a fifth amendment on July 1, 2009, which extended the term through June 30, 2012. (Ex. M–16). On May 15, 2010, VPBP and Acme Security executed a new lease. It is clear that, under these documents, Acme Security paid the rent for the period during which it occupied the premises, other than the few days it occupied the premises after the acquisition in May, for which ALK had paid the rent. (Ex. M–16, Ex. C–23).

Acme Security made payments on some debts that ALK owed. Acme Security did not change the account that ALK had with Georgia Power for electricity and continued to pay for electricity billed to that account (Ex. C–8), it paid for telephone services billed to ALK on April 20, 2009 in the amount of $543.43, (Ex. C–9), and it made payments to Wachovia Bank on loans secured by motor vehicles that it acquired from ALK. (Ex. C–14 and C–15).

After its acquisition of ALK's assets, Acme Security reimbursed one of its employees for the $922.38 he paid for motor vehicle repairs made prior to the acquisi-

---

**16.** Exhibits C–18 and C–19 do not support this conclusion. Exhibit C–18 reflects billing for services in May 2008, which may have been prior to the acquisition. Exhibit C–19 is an invoice dated March 26, 2008, and reflects payment on that pre-acquisition date.

tion (Ex. C–11), paid $71.43 to the Georgia Department of Revenue for a 2007 tax ALK owed (Ex. C–10), and paid $ 650 ALK owed to the U.S. Trustee arising out of its chapter 11 case. (Ex. C–13).

With the exception of the reimbursement of an employee for vehicle repairs, payments of ALK's tax bill, telephone bill, and U.S. Trustee fees, and payments on car loans, the evidence does not reflect that Acme Security paid any debts of ALK for anything other than items that Acme Security itself incurred in connection with the operation of its business after the acquisition. None of the debts of ALK that Acme Security paid were for ordinary trade debts that ALK had incurred and that led to the bankruptcy case. It did not make any payments on the loans of approximately $195,000 that Mr. Hassebrock and his wife had made to ALK. The ALK debts that Acme Security paid were either *de minimis* or related to the post-acquisition operation of its business.

Upon the acquisition of ALK's assets, Acme Security retained the employees who provided services through an employee leasing company. Nothing in the evidence contradicts Mr. Hassebrock's testimony that Acme Security hired the employees.

CLN's evidence includes three emails relating to the collection of accounts receivable written by Melissa Milligan, an employee of ALK, in February and April 2008 (times prior to ALK's rejection of its lease with CLN and the dismissal of its case). On the emails, "Acme Security Inc." appears beneath her name, and the street address is the address of the premises that ALK leased from CLN. (Ex. C–24, C–25, C–26). Accompanying the two emails sent in February (Ex. C–24, C–25) are invoices from "Acme Security." Accompanying the third email sent in April is an account statement reflecting "ALK Holdings, InC [sic] ABF dba Acme Security." (Ex. C–26).

The evidence does not include any significant testimony with regard to these emails other than Mr. Hassebrock's authentication of them and his confirmation that Ms. Milligan worked for ALK in collecting amounts due from customers. The Court finds the evidence inconclusive and insignificant in the context of the issues in this matter.

Acme Security was a trade-name that ALK used in its business, and the invoices with its name on them includes the statement, "Security Specialists Since 1928." The Court finds that all of these email communications relate to the collection of accounts receivable of ALK for its benefit. They were not invoices for amounts due to Acme Security, they do not establish that Acme Security was operating ALK at the time, and they do not establish that Ms. Milligan worked for Acme Security.

Even on the assumption that the emails establish that Acme Security was using ALK employees in the furtherance of its business operations, the Court declines to attach any significance to Acme Security's incidental use of ALK employees over a year prior to the transactions in question. Absent any evidence of substantial intermingling of ALK's and Acme Security's assets, businesses, and operations prior to Acme Security's acquisition of ALK's assets through exercise of its rights as a secured lender, and none exists, the Court declines to attach any significant evidentiary or legal effect to the emails or their attachments.

In January 2010, CLN filed a complaint in the State Court of Cobb County, No. 10–A–215–6, against ALK, Acme Security, and Mr. Hassebrock. (Ex. M–18). On August 24, 2010, ALK filed a chapter 7 case, No. 10–84425–MGD. (Ex. M–19). ALK listed $ 992,000 in unsecured debts

(*id.* at 16–63), including a disputed claim of $ 465,640.02 owed to CLN (*id.* at 33) and $195,694.65 to Michael and Donna Hassebrock (*id.* at 50). Other unsecured claims thus totaled approximately $ 331,000.

Counsel for CLN advised the chapter 7 trustee, Tamara Ogier, and the United States Trustee of its position that Acme Security "ought to stand good for ALK's debts" and that "during the first bankruptcy, customer payments and other funds which were paid to ALK and should have gone into the bankruptcy estate were diverted into Acme, thus denying ALK's creditors any relief." (Ex. M–20 at 2). CLN requested an investigation of the claims and transactions involving Acme Security. The chapter 7 case was closed following the trustee's filing of a "Report of No Distribution" ("RND"). No evidence in this matter supports any of CLN's allegations in the letter.

### III. Conclusions of Law

■ As a general rule, a corporation purchasing the assets of another corporation does not assume the liabilities of the selling corporation. *E.g., Carswell v. National Exchange Bank of Augusta,* 165 Ga. 351, 140 S.E. 755 (1927). As the Supreme Court of Georgia stated in *Bullington v. Union Tool Corp.,* 254 Ga. 283, 284, 328 S.E.2d 726 (1985), however, the general rule does not apply if "(1) there is an agreement to assume liabilities; (2) the transaction is, in fact, a merger; (3) the transaction is a fraudulent attempt to avoid liabilities; or (4) the purchaser is a mere continuation of the predecessor corporation." *Accord, e.g., Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451, 1456–57 (11th Cir.1985).

CLN invokes the third and fourth exceptions. Thus, CLN asserts that Acme Security is liable for ALK's debt to it either because Acme Security's acquisition of ALK's assets was a "fraudulent attempt to avoid liabilities" or because Acme Security is a "mere continuation" of ALK. The Court will consider each in turn.

### A. Fraudulent Attempt to Avoid Liabilities

Although the Supreme Court of Georgia stated in *Bullington v. Union Tool Corp.,* 254 Ga. 283, 328 S.E.2d 726 (1985), that a corporation purchasing the assets of another corporation is liable for the seller's debts if the transaction is a "fraudulent attempt to avoid liabilities," it did not discuss what constitutes such conduct. The parties have not cited any Georgia cases dealing with the issue, and the Court has found none.

The *Bullington* court's formulation of the rule appears to require at least two elements. First, the transaction must be an attempt to avoid liabilities. Second, the attempt must be fraudulent. It follows that the fact that the purpose or intent of a transaction is to avoid liabilities, standing alone, does not impose successor liability on the purchaser.

So the question becomes, when is an attempt to avoid liabilities fraudulent? The traditional analysis of common law fraud provides little guidance. A claim for fraud generally requires a willful misrepresentation, or perhaps concealment, of a material fact on which a person relies to her detriment. O.C.G.A. § 51–6–2. One corporation's acquisition of the assets of another involves no representation, false or otherwise, on which a creditor relies.

The type of fraudulent conduct to which this formulation refers must, therefore, be something different. In this regard, fraud has been defined as including any deceit, artifice, trick, or design involving active operation of the mind, used to circumvent and cheat another. *McClellan v. Cantrell,* 217 F.3d 890 (7th Cir.2000). The concepts

of "circumventing" and "cheating" appropriately describe the type of conduct that should properly trigger successor liability as a fraudulent attempt to avoid liabilities.

An insider's formation of a new company to acquire a debt secured by all of his company's assets and the new company's later acquisition of the company's assets through exercise of his rights as a secured creditor legitimately subjects the transaction to careful scrutiny. For example, such a transaction could be a fraudulent attempt to avoid liabilities if the debt is not legitimate, if it is subject to dispute or to counterclaims, or if the security interest is subject to challenge in bankruptcy or otherwise. Similarly, a transaction could be fraudulent if the fair market value of the transferred assets is significantly less than the amount of the secured debt, or if the debtor company has significant unencumbered assets that the new company acquires. In such circumstances, the transfer of assets with realizable equity to a new company circumvents and cheats existing creditors by making those assets unavailable to satisfy their claims.

■ The evidence does not indicate that any of these circumstances exist. It is clear that ALK was hopelessly insolvent and could not generate sufficient revenues to pay debt service on its secured debt, let alone deal with its unsecured creditors. Repossession and sale of the company's assets through the secured creditor's exercise of its remedies would have produced nothing at all for CLN or any other creditor of ALK.

■ It is true that the directors of an insolvent corporation under Georgia law effectively hold its assets in trust for the benefit of creditors and cannot use them for their personal gain. *See, e.g., Hall Hardware Co. v. Ladson Brick & Tile Co.,* 160 Ga. 341, 127 S.E. 754 (Ga.1925); *Lowry Banking Co. v. Empire Lumber Co.,* 91

Ga. 624, 17 S.E. 968 (Ga.1893). It is likewise true that officers and directors of a corporation have a fiduciary duty to the corporation not to take advantage of a corporate opportunity. O.C.G.A. § 14–2–831(a)(1)(C); *e.g., Brewer v. Insight Technology, Inc.* 301 Ga.App. 694, 695, 689 S.E.2d 330 (Ga.App.2009); *Mau, Inc. v. Human Technologies, Inc.,* 274 Ga.App. 891, 894, 619 S.E.2d 394 (Ga.App.2005).

■ But any such trust or fiduciary duties do not require a principal to infuse new capital into a clearly insolvent corporation or to continue to operate the business when its debt burdens clearly make that impossible.

Mr. Hassebrock legitimately formed Acme Security to acquire a valid debt from the Bank that was secured by all of ALK's assets that were worth substantially less than that debt. Acme Security had the right to conduct a commercially reasonable sale of those assets that would obviously have resulted in the liquidation of ALK, the cessation of its business, and no hope for CLN or any other creditor. O.C.G.A. § 11–9–610.

Instead, Mr. Hassebrock chose to cause both companies to agree to a transfer of the assets to Acme Security in full satisfaction of ALK's secured debt, as O.C.G.A. § 11–9–620 permits. The result of the transaction did not circumvent or cheat CLN, which had no effective remedy if Acme Security had liquidated the collateral in the usual way. In these circumstances, Acme Security's acquisition of ALK's assets was not a "fraudulent attempt to avoid liabilities." Rather, it was a legitimate way to apply its collateral to its debt that did not cause injury to CLN or any other creditor.

Accordingly, CLN's claim that Acme Security is liable as a successor to ALK because its acquisition of its assets was a

fraudulent attempt to avoid ALK's liabilities is without merit.

## B. Mere Continuation of the Predecessor Corporation

■ A corporation that purchases the assets of another corporation is liable for the debts of the seller corporation if it is a "mere continuation of the predecessor corporation." *E.g., Bullington v. Union Tool Corp.,* 254 Ga. 283, 284, 328 S.E.2d 726 (1985). *Accord, e.g., Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451, 1456–57 (11th Cir.1985). In the context of a contractual liability,[17] the essential elements for the imposition of successor liability under the "mere continuation" theory are a substantial identity of ownership and a complete identity of corporate objects and assets. *E.g., Perimeter Realty v. GAPI, Inc.,* 243 Ga.App. 584, 533 S.E.2d 136 (2000); *Pet Care Professional Center, Inc. v. BellSouth Advertising Publishing Corp.,* 219 Ga.App. 117, 464 S.E.2d 249 (1995). Thus, Georgia courts have refused to impose successor liability in the absence of a continuation of ownership, *First Sup-* *port Services, Inc. v. Trevino,* 288 Ga.App. 850, 655 S.E.2d 627 (2007),[18] or when a complete identity of assets is lacking. *Perimeter Realty v. GAPI, Inc.,* 243 Ga.App. 584, 533 S.E.2d 136 (2000).

■ The "mere continuation" ground for successor liability is a common law doctrine,[19] equitable in its origin and nature,[20] that is "designed to prevent a situation whereby the specific purpose of acquiring assets is to place those assets out of reach of the predecessor's creditors."[21] Given the purposes of the doctrine, the substance of the transactions transferring assets to the new corporation must prevail over its form. "[E]quity is loath to elevate the form of the transfer over its substance, and deigns to inquire into its true nature."[22]

■ An analysis of the substance of the transactions in this matter reveals the presence of the essential requirements for application of the mere continuation theory. Substantial continuity of ownership is present because Mr. Hassebrock was a

---

17. Different standards for the imposition of successor liability may apply when the claim is based on the strict liability of a manufacturer of a defective product in tort, *e.g., Farmex Inc. v. Wainwright,* 269 Ga. 548, 501 S.E.2d 802 (1998) or when other policy considerations require them, such as when the claim involves federal labor policy. *E.g., Evans Services, Inc. v. N.L.R.B.,* 810 F.2d 1089 (11th Cir.1987). Because such claims involve different policy considerations from those involved in a simple contractual claim, the more lenient rules for successor liability that apply in such cases do not govern this matter. *See Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451, 1458 n. 1 (11th Cir.1985).

18. *Accord, Bud Antle, Inc. v. Eastern Foods, Inc.,* 758 F.2d 1451, 1456–57 (11th Cir.1985).

19. *See Farmex, Inc. v. Wainwright,* 269 Ga. 548, 501 S.E.2d 802 (1998); *Perimeter Realty v. GAPI, Inc.,* 243 Ga.App. 584, 593, 533 S.E.2d 136 (2000).

20. *See, e.g., Coffman v. Chugach Support Services, Inc.,* 411 F.3d 1231, 1238 (11th Cir. 2005); *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.,* 124 F.3d 252, 267–68 (1st Cir.1997) ("[S]uccessor liability is an equitable doctrine, both in origin and nature.") (collecting cases); *Baker v. Delta Air Lines, Inc.,* 6 F.3d 632, 637 (9th Cir.1993) ("Successorship liability is an equitable doctrine so that fairness is a primary consideration."); *Tindall v. H & S Homes, LLC,* 2011 WL 4345189 (M.D.Ga.2011).

21. 15 Fletcher Cyclopedia of the Law of Corporations (Westlaw) § 7124.10 (last visited November 14, 2012).

22. *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.,* 124 F.3d 252, 268 (1st Cir.1997) (collecting cases).

shareholder of, and controlled, both corporations. Although his wife was a shareholder of ALK but not of Acme Security, this change in ownership is not controlling.

■ Spouses may ordinarily be considered as a single economic unit in the absence of unusual circumstances that would show that the spouses actually had independent economic or other interests that would require viewing them separately. The evidence shows no such circumstances here. Thus, in substance, the Hassebrock spousal unit owned shares of both Acme Security and ALK, and the manner in which they allocated that ownership interest among themselves is not material. This satisfies the requirement of substantial identity of ownership that Georgia law requires. *E.g., Pet Care Professional Center, Inc. v. BellSouth Advertising Publishing Corp.*, 219 Ga.App. 117, 464 S.E.2d 249 (1995).

■ Similarly, the requirements of identity of assets and objects have been met. The two corporations were not engaged in exactly the same types of business, and their assets were not completely identical. For example, Acme Security was engaged in the electronic security business that ALK did not do and could not do because it lacked the required license. Further, it appears that Acme Security had a separate asset in the form of a bank account at SunTrust Bank.

But these differences, under a substance over form analysis, are not sufficient to establish that the two companies had different assets or objects. With regard to assets, the fact that, after the transaction, Acme Security had a bank account in addition to all of the assets of ALK is *de minimis*. As a matter of substance, Acme Security and ALK had the same assets.

With regard to corporate objects, a fair inference from the evidence is that Mr.

Hassebrock essentially performed personal services through Acme Security in the field of electronic security, for which he held the required license. ALK lacked a license and, therefore, did not, and could not, provide such services.

The fact that, after the transaction, Acme Services continued to engage in the electronic security business in which ALK was not engaged, however, does not establish that Acme Security had different corporate objects than ALK. Acme Security did the same business after the transaction that ALK had done before the transaction. It did not deploy ALK's assets for some other purpose. As a matter of substance over form, the two companies had the same corporate objects.

These conclusions do not end the inquiry. The further question is whether existence of the essential elements requires imposition of successor liability under the mere continuation theory if the existence of other factors establishes that the successor liability doctrine should not apply based on equitable principles and the fundamental purposes of the doctrine.

At least four other factors are present here. First, Acme Security acquired ALK's assets through a valid exercise of its rights as a secured creditor under the Uniform Commercial Code and in doing so paid substantially more for the assets than they were worth. Second, ALK was hopelessly insolvent and could not realistically continue its business. Third, nothing indicates that the transactions specifically targeted CLN's debt for avoidance; except for payments on motor vehicle loans and post-transaction expenses such as rent and utilities and some *de minimis* payments for taxes, U.S. Trustee fees, and an employee reimbursement, Acme Security did not pay any of the other unsecured debts of ALK, which totaled almost $1 million. Finally, it is clear that, in the absence of

the transactions, CLN could not possibly have recovered on its claim from ALK. Thus, Acme Security's acquisition of ALK's assets caused no wrong or injury to CLN or any other unsecured creditor.

Georgia courts have not considered whether a secured creditor's acquisition of its collateral from a debtor corporation through the exercise of its remedies under the Uniform Commercial Code insulates the creditor from the imposition of successor liability as a mere continuation of the debtor or whether the existence of other factors may negate successor liability even if the essential elements are met.

Courts in other jurisdictions generally agree that an intervening exercise of a secured creditor's rights with regard to its collateral does not provide an automatic exemption from the imposition of successor liability. *E.g., Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.,* 124 F.3d 252, 267 (1st Cir.1997) (applying Rhode Island law) (collecting cases); *Glynwed, Inc. v. Plastimatic, Inc.,* 869 F.Supp. 265, 273–75 (D.N.J.1994) (applying New Jersey law) (collecting cases). Cases such as *Ed Peters Jewelry* and *Glynwed* indicate that the mere continuation inquiry in such a context does not include consideration of anything beyond the essential elements. A different view is that a creditor must demonstrate some prejudice as a result of the transaction in order to prevail under the mere continuation theory of successor liability. *Central Business Forms, Inc. v. N–Sure Systems, Inc.,* 540 So.2d 1029 (La. Ct.App. 2 Cir.1989). And one court, in affirming the trial court's grant of summary judgment that a corporation that acquired assets of a debtor corporation through a valid UCC sale of collateral was not liable as a continuation of the debtor, has stated, "Lacking proof of overreaching or lack of good faith, directors, officers, or stockholders who foreclose against collat-

eral by reason of a defaulted corporate loan do not violate any duty owing to the corporation or interested party." *R.J. Enstrom Corp. v. Interceptor Corp.,* 555 F.2d 277, 283 (10th Cir.1977).

Georgia law codifies a general principle of equity that applies here. O.C.G.A. § 23–1–3 states:

> Equity jurisdiction is established and allowed for the protection and relief of parties where, from any peculiar circumstances, the operation of the general rules of law would be deficient in protecting from anticipated wrong or relieving for injuries done.

Applying this principle, the Court concludes that Georgia law does not automatically insulate a corporation from the imposition of successor liability as a mere continuation of a previous entity when the corporation acquires its assets through exercise of its rights as a secured creditor under the UCC.

Given that the imposition of successor liability on the mere continuation theory requires continuity of ownership, the existence of an insider relationship will always be present in a mere continuation dispute. The possibilities of overreaching or inequitable conduct when an insider controls both debtor and creditor corporations through the application of the usual legal rules require an inquiry into the substance, not merely the form, of the transaction to ensure the protection of innocent parties and to provide a remedy for any injury that results. Further, the transaction should be scrutinized to ensure that it is legitimate and does not deprive unsecured creditors of realizable equity value in transferred assets, as discussed earlier in Part III(A).

The fact that Acme Security acquired its assets through the valid exercise of its UCC rights, therefore, does not provide a

safe harbor that prevents imposition of successor liability as a mere continuation of ALK.

The Court thus turns to whether Acme Security may avoid successor liability as a mere continuation of ALK based on the existence of other factors the Court identified above. Georgia courts have not expressly considered this issue. An examination of the Georgia cases imposing successor liability on the mere continuation theory in the contractual context, however, shows that none of these circumstances were present. To the contrary, as the following discussion explains, the transactions in the Georgia cases deprived the creditors of a remedy they would have had in the absence of the transactions.

The Court has found five cases in which the Georgia courts have found a successor corporation to be a "mere continuation" of its predecessor in a contractual setting. Three of them do so without elaboration or

consideration of the facts and circumstances. As such, they are not helpful in the current inquiry.[23] The Court will, therefore, focus on the other two.[24]

The first is *Johnson–Battle Lumber Co. v. Emanuel Lumber Co.*, 33 Ga.App. 517, 126 S.E. 861 (1925). There, new stockholders acquired one-half of the old corporation's stock from its sole shareholder. Thereafter, as the court explained, all of the new shareholders incorporated the new company "for the same objects and purposes under a charter creating a new corporation having in effect the same name, which [took] over the entire assets and business of the older corporation," and the new corporation operated in the same place and in the same manner as the old corporation. *Id.*

The court also observed, with no further factual explanation, that the new corporation "[became] liable for the debts of the old corporation." *Id.* Given this recitation

**23.** *Ney–Copeland & Associates, Inc. v. Tag Poly Bags, Inc.*, 154 Ga.App. 256, 267 S.E.2d 862 (1980) (In upholding personal jurisdiction over corporation under Georgia's long-arm statute in suit arising out of contract negotiated in Georgia with partnership prior to incorporation of the corporate defendant, the court concluded that the trial court was authorized to find that, by identity of name, assets, objects, and stockholders (the former partners), the corporation was in fact a successor to the partnership and that it had assumed and was liable for the obligations of the prior partnership such that it had minimum contacts with Georgia as a successor to the partnership.); *Davis v. Concord Commercial Corp.*, 209 Ga.App. 595, 434 S.E.2d 571 (1993)· (The court applied the continuation theory to uphold a guarantor's liability to an affiliated corporation of the original creditor); *Chatham Finance Co. v. Eitel*, 66 Ga.App. 643, 19 S.E.2d 54 (1942) (Complaint alleging that the defendant corporation had succeeded to all of the assets of the predecessor corporation that had made an allegedly usurious loan is not subject to general demurrer on ground

that the defendant was not the contracting party.).

**24.** District courts in Georgia have also applied the mere continuation theory to conclude that a corporation is a successor to a predecessor entity. *General Star Indemnity Co. v. Elan Motorsports Technologies, Inc.*, 356 F.Supp.2d 1333, 1339 (N.D.Ga.2004) (Corporation is successor to its subsidiary where subsidiary never had officers, directors, or employees; parent's employees conducted subsidiary's business in parent's office space, and parent took over subsidiary's assets, including its bank account, and conducted subsidiary's business without interruption.); *Dickerson v. Central Life Ins. Co.*, 932 F.Supp. 1471 (M.D.Ga.1996) (In view of complete identity of ownership and virtual identity of management, life insurance company is continuation of predecessor.). *See also Forsberg v. Pefanis*, 2010 WL 397584 (N.D.Ga. 2010) (Discussing continuation theory in the course of ruling that party should be added as a party defendant under Fed.R.Civ.P. 25(c) because it engaged in a fraudulent transaction to avoid a judgment).

and the factual context of the case, it appears that the new corporation upon its formation paid existing debts of the predecessor corporation in the ordinary course of business as they became due.

The dispute in *Johnson–Battle Lumber* arose when the new corporation sued the defendant for amounts due for lumber on a contract made by the old corporation but which the new corporation accepted and filled. The defendant sought to set off damages for a breach of contract that occurred prior to the new corporation's acquisition of the assets. *Id.*

Concluding that the evidence authorized an inference that the new corporation was "but a continuance of the other," the court ruled that it was error for the trial court to grant a directed verdict in favor of the new corporation with regard to the set-off. *Id.*

In the second case, *Pet Care Professional Center, Inc. v. BellSouth Advertising & Publishing Corp.,* 219 Ga.App. 117, 464 S.E.2d 249 (1995), some of the partners in a partnership formed a new corporation to continue the partnership's pet care business one month after the partnership had contracted for advertising in the Yellow Pages. The assets of the two entities did not change, and both businesses used substantially the same names and operated from the same location with the same telephone service and accounts. Relying on *Johnson–Battle Lumber,* the court ruled on these undisputed facts that the new corporation was liable under the "mere continuation" theory.

The factual patterns in both *Johnson–Battle Lumber* and *Pet Care* are the same in important material respects. Critically, the successor entity in each case obtained the benefits of an existing contractual relationship between the creditor and the predecessor. Neither case mentions the manner in which the successor corporation acquired the assets of its predecessor, and

nothing indicates that the predecessor received any consideration for its assets.

Moreover, the cases do not address the financial situation of the predecessor entity or whether the predecessor entity would have had the financial capability to pay the obligation in question if the change in ownership had not occurred. To the contrary, the facts in *Johnson–Battle Lumber* indicate that the successor continued the payment of the predecessor's debts in the ordinary course of business, and the recitation of the facts in *Pet Care* leads to a similar conclusion.

In both *Johnson–Battle Lumber* and *Pet Care,* then, the imposition of successor liability based on the mere continuation of the predecessor was necessary in order to avoid the application of legal principles that would have resulted in injury to the creditor: the loss of its remedy against the predecessor. Further justification for holding the successor liable was that the successor had obtained the benefit of the consideration the creditor had provided to the predecessor—a lumber contract that the successor sought to collect on in *Johnson–Battle Lumber* and the Yellow Pages advertising in *Pet Care.* Finally, it appears likely that, in both cases, the successor corporation had in general continued the payment of other debts of the predecessor in the ordinary course of business.

None of the Georgia cases state any requirements for imposition of successor liability based on the mere continuation theory beyond the essential elements of identity of ownership, assets, and objects, but none of them involved the additional considerations present in this case. At the same time, none of them expressly holds that existence of the essential elements precludes a showing that the new corporation is not a "mere continuation" for other reasons.

In view of the equitable principles codified in O.C.G.A. § 23–1–3, as set forth above, the Court concludes that Georgia law permits a corporation that acquires assets for fair and adequate consideration through a legitimate exercise of its remedies under the Uniform Commercial Code to establish that it is not a "mere continuation" of the original debtor when it does not receive the benefit that the original debtor received arising from the debt in question; when the transaction generally affects all existing creditors equally; and when the transaction does not deprive the creditor of a remedy against the debtor because, as a matter of fact, it had no such remedy. A contrary conclusion would elevate form over substance in an area of the law in which substance is to prevail over form.

 In this regard, the economic realities are that Acme Security is a substantially different company from ALK and not a "mere continuation." Acme Security paid more than adequate consideration for the assets by accepting the assets in full satisfaction of a debt that substantially exceeded their value. ALK was hopelessly insolvent and doomed to liquidation in the absence of the transaction in question. As a matter of economic reality, ALK's business could not continue under its existing debt structure. In substance, Acme Security cannot be a successor that continued ALK's business because ALK effectively had no business that it could realistically continue.

Moreover, the evidence does not establish that Acme Security continued the operation of ALK's business by making any significant payments on any of ALK's other debts. Thus, the transactions did not target CLN, but affected almost all of ALK's creditors, including, of course, the Hassebrocks, who had loaned it approximately $195,000. The evidence does not show that Acme Security made any payments to them on that debt or that Acme Security or the Hassebrocks considered Acme Security to be obligated for it. Simply put, the transactions did not "target" CLN.

In any event, it is quite obvious that the transactions did not, and could not, unfairly deprive CLN of a remedy against ALK because CLN had no remedy against ALK. In the absence of Acme Security's acquisition of the assets in full satisfaction of the debt under O.C.G.A. § 11–9–620, ALK would have discontinued its business and Acme Security would have conducted a liquidation sale that would have produced substantially less in proceeds than the amount of its debt. Nothing in the evidence suggests that sale of the assets as a going concern to an unrelated party would have produced anything in excess of the amount of the secured debt.

In short, Acme Security's acquisition of the assets did not cost CLN a single penny. In this situation, imposition of successor liability on Acme Security as a "mere continuation" of ALK would not serve the purpose of that equitable doctrine, which is to protect creditors from having assets of a debtor entity put beyond their reach through manipulation of corporate forms.

Further, imposing the remedy here would not protect CLN or other creditors of ALK from a wrong or injury arising from the operation of the general rules of law, as the equitable principles of O.C.G.A. § 23–1–3 require. To the contrary, application of the mere continuation theory would provide CLN a windfall by giving it a remedy it could not possibly have had in the absence of the transactions.

The Court concludes, therefore, that Acme Security is not a "mere continuation" of ALK and that Acme Security,

therefore, is not liable for ALK's debt to CLN.

In reaching this conclusion, the Court has considered cases such as *Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 124 F.3d 252 (1st Cir.1997) (applying Rhode Island law) and *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265, 273–75 (D.N.J.1994) (applying New Jersey law). These cases hold that a purchaser of assets through a UCC sale is liable as a "mere continuation" of the debtor if the essential elements are present, without regard to whether the transaction resulted in any actual prejudice to the creditor.[25]

The cases are factually distinguishable. In both cases, the new corporation after the acquisition of assets at a UCC sale made significant payments on debts owed by the original corporation that were essential for continuation of the business. Indeed, it appears that the transactions effectively targeted the debts of the plaintiff creditors and perhaps others for elimination while not affecting most creditors. Moreover, an original lender in both cases financed part of the purchase price.

Here, in contrast, Acme Security paid the original lender wholly in cash with funds received through financing from Mr. Hassebrock, and it did not pay any existing unsecured debts of ALK, with immaterial exceptions. In this sense, the substitution of new financing and the absence of payment of ALK's unsecured debt breaks the connection between ALK and Acme Security so that Acme Security is not a mere continuation of ALK. And the fact that all of ALK's unsecured creditors received the same treatment eliminates the taint of discriminatorily unfair treatment of the plaintiff creditors that, to some extent, taints the purchasing corporations' arguments in *Glynwed* and *Ed Peters Jewelry*.

At the same time, these distinctions are arguably immaterial in the context of the substance over form analysis that governs application of the mere continuation theory of successor liability. If, as the Court has concluded, successor liability does not apply if a creditor has not been prejudiced, it logically makes no difference who finances the transaction or what other existing debts are paid.

To the extent that *Glynwed* and *Ed Peters Jewelry* are not distinguishable, the Court declines to apply their approach in this matter in view of its analysis of Georgia law set forth above. The fundamental reasons are that application of the mere continuation doctrine here would extend it to a situation in which its purpose does not exist and would disregard the equitable principles embodied in O.C.G.A. § 23–1–3.

The basis for the imposition of successor liability is to prevent the manipulation of corporate forms of ownership of assets and conducting business and the general rule

---

**25.** Neither case expressly discusses the issue, although the issue was presented in *Ed Peters Jewelry*. In *Ed Peters Jewelry*, the district court had granted the purchasing corporation's motion for judgment as a matter of law at the conclusion of the creditor's evidence at a jury trial on the ground that the creditor could not have been prejudiced because it did not prove that the assets were worth more than the secured indebtedness. 124 F.3d at 261, 266–67. The court reversed and remanded for a jury trial, concluding that the evidence established trialworthy issues of material fact on the essential elements of a successor liability claim. *Id.* at 269–74.

On remand, noting that the "mere continuation" issue is a matter of equity not suitable for jury trial, the trial court made findings of fact that the consideration exchanged for the assets was adequate and the plaintiff could not, therefore, establish the elements of successor liability that Rhode Island law requires. *Ed Peters Jewelry Co. Inc. v. C & J Jewelry Co., Inc.*, 51 F.Supp.2d 81 (D.R.I. 1999), *aff'd* 215 F.3d 182 (1st Cir.2000).

of nonliability to place assets of the original debtor entity beyond the reach of creditors with valid claims. When it is obvious, as it is here, that the assets of the original debtor are *already* beyond the reach of its creditors as a matter of economic reality, imposing successor liability on the corporation acquiring the assets does not serve the purpose of the exception.

In this regard, it is important to keep in mind that the purpose of the mere continuation doctrine is not to ensure payment of the debts of a corporation that sells its assets to another. If that were the basis for the doctrine, then the law would necessarily require any purchaser of assets to assume all existing debts. Rather, the mere continuation doctrine exists to protect a creditor who *has* a remedy from being unfairly deprived of the loss of that remedy. The doctrine does not properly extend to provide a remedy for a creditor who did not have one against the original debtor and who has actually lost nothing.

These principles, of course, are exactly what O.C.G.A. § 23-1-3 embodies. Equity provides for the "protection and relief" of a party when general rules of law are deficient in protecting it "from anticipated wrong or relieving for injuries done." *Id.* When a party has suffered no wrong or injury, equity does not properly grant relief. Indeed, to do so in this matter would effectively provide CLN a windfall by giving it a remedy when it had none.

Imposing successor liability under the "mere continuation" theory here would effectively require the liquidation of a closely-held, family-owned corporation (or other limited liability entity) that suffers financial reversals and ends up with assets worth substantially less than the debt that encumbers them, unless a sale to an independent third party can be arranged. As this matter illustrates, a third-party sale of a hopelessly insolvent company in many instances is not possible; the only hope for realization of any going concern value, the preservation of jobs, and the avoidance of disruption of customer expectations is for the existing owners-managers to take the assets and start over. If an owner-manager who does so ends up with a new company that remains liable for all of the existing debts, such a course of action obviously makes no sense.

An owner-manager in such a situation would face a Hobson's choice: start over with a new entity that has the same impossible financial problems as the existing one or suffer the liquidation of the existing one. Of course, the latter outcome will most likely be the eventual result of the former choice. A new corporation burdened with the debts of the existing one will have no better hope of continuing its operations in the long term.

It is noteworthy, also, that a rule imposing successor liability in the circumstances of this matter would limit the ability of a secured lender to a family-owned company to recover as much as possible from its collateral. If the only potential purchaser of assets is the owner-manager and the prospect of incurring liability for all of the existing debts after a UCC disposition of collateral makes the owner-manager's participation in such a transaction economically infeasible, the only remedy for the lender will be the liquidation of the assets. It is axiomatic that a lender will realize substantially less in a liquidation than if it could effect a sale of assets and business as a going concern.

All of these consequences, of course, have societal costs in addition to economic losses. Employees lose jobs and face disruption of their economic lives. Persons in Mr. Hassebrock's situation and their families whose livelihood is based on their earnings from a family company may not be able to replace such income and may

encounter financial disaster if liquidation of the business' assets results in substantial liability on a personal guarantee because the distressed sale of assets pays only a fraction of the debt.

And the Court repeats: all of these consequences and costs would flow because of a rule providing a remedy for creditors who otherwise have none. Further, ironically, existence of such a rule would mean that, in future situations of this nature, there will be no prospect of successor liability because there will be no successor. The only economically logical choice for the owner-manager is to permit the existing company to suffer liquidation.

So the Court declines to adopt what would essentially be a *per se* rule that a corporation acquiring substantially over-encumbered assets of a debtor corporation with the same ownership through exercise of its UCC remedies becomes liable for all of the debts of the former company.

For all of the foregoing reasons, the Court concludes that Acme Security is not liable for the debts of ALK to CLN as a "mere continuation" of ALK.

### IV. Conclusion

Based on the foregoing findings of fact and conclusions of law, the Court concludes that Acme Security is not liable on ALK's debt to CLN. Acme Security did not acquire ALK's assets in a fraudulent attempt to avoid ALK's liabilities, and Acme Security is not a "mere continuation" of ALK. In view of this ruling, the Court need not conduct further proceedings to determine the amount of CLN's claim.

Although this result is unsatisfactory to CLN, the Court notes that, even if CLN had prevailed, its victory would in all likelihood be Pyrrhic. If the Court concluded that Acme Security is liable on ALK's debt to CLN, it must similarly be liable to every other creditor of ALK. ALK's schedules showed unsecured debt to unsecured creditors, including CLN, of almost $1 million. Acme Security's assets, of course, consist of substantially the same assets that ALK had, and nothing indicates that the passage of time and another bankruptcy case have done anything to improve their value; Acme Security values them at $ 136,873.27 in its schedules. (Ex. M–21 at 10). And as in the case of ALK, the assets are subject to an apparently valid secured claim of $392,500 that Mr. Hassebrock now holds. (*Id.* at 12).

Perhaps CLN is optimistic that, if it prevailed, Acme Security would propose a chapter 11 plan to pay a substantial amount of its unsecured debt and that CLN could prevent Acme Security from confirming a plan that does not provide a significant recovery for unsecured creditors. But if Acme Security does not or cannot obtain confirmation of a chapter 11 plan, the predictable result is a sale of its assets, either under 11 U.S.C. § 363 in this case or through Mr. Hassebrock's exercise of his right to sell the collateral under the Uniform Commercial Code and, in either case, application of all of the proceeds to the secured debt with nothing available to pay CLN or other unsecured creditors.

The Court will enter a separate judgment sustaining Acme Security's objection to CLN's claim and disallowing it.