540 So.2d 1029 (1989)
CENTRAL BUSINESS FORMS, INC. Plaintiff-Appellant,
v.
N-SURE SYSTEMS, INC., et al Defendants-Appellees.
No. 20,292-CA.
Court of Appeal of Louisiana, Second Circuit.
February 22, 1989.
*1030 John S.C. Massey, West Monroe, for plaintiff-appellant.
Davenport, Files & Kelly by William G. Kelly, Jr., Monroe, for defendants-appellees.
Before MARVIN, NORRIS and LINDSAY, JJ.
MARVIN, Judge.
In this action on unsecured promissory notes executed by N-Sure Systems, Inc. for the balance due on an open account, the plaintiff creditor appeals a judgment rejecting its demands against Businessland, Inc., to whom N-Sure transferred certain of its assets, and against Mr. and Mrs. Williamson, who were the sole shareholders of each corporation.
The creditor alleged the sale of assets was a scheme to defraud creditors and sought recovery against Businessland under the Bulk Sales Law, LRS 9:2961-2968. Recovery personally from Mr. and Mrs. Williamson was sought on allegations that they had undercapitalized the corporations, disregarded corporate formalities, wasted and unlawfully distributed corporate assets, so as to become the alter ego of the corporations. These allegations form the basis of plaintiff's assignments of error in this appeal.
Plaintiff's demands were dismissed after trial on the merits. The trial court concluded that the Bulk Sales Law was inapplicable because N-Sure was engaged primarily in the service-oriented business of providing computerized insurance rating information to independent insurance agents. The court also found that the transfer of assets did not prejudice plaintiff, an unsecured creditor, because the assets, at all times, had been assigned or pledged to secure other creditors of N-Sure. The trial court found that plaintiff's allegations against Mr. and Mrs. Williamson were not proved.
We affirm.

FACTS
N-Sure developed and devised computer software programs to provide independent insurance agents current and comparative rates for personal and commercial lines of insurance. Each agent-customer was offered a customized software package which included only the rates of the insurance companies whose policies that agent sold. To maintain current rates, N-Sure sold to its customers "maintenance contracts" for an advance annual fee and periodically furnished *1031 updated software. The software was compatible with the computer hardware used by most independent agents who were N-Sure's potential customers.
If the customer did not have computer hardware, N-Sure would attempt to sell it to the customer as a part of the "package." N-Sure generally had from two to five hardware units on hand for potential customers. N-Sure used its own hardware to update the rates. N-Sure also had on hand, for its use and for customers, printer paper and computer supplies, including the computer diskettes which incorporated the periodical rate changes that were furnished to customers.
N-Sure purchased most of these supplies from plaintiff, about $165,000 worth during the two years beginning in late 1981. In October 1983, N-Sure signed notes totaling about $36,000 for the balance it owed plaintiff on the account. N-Sure signed another note for $21,000 in February 1984, and thereafter, on a cash basis, made about $75,000 in purchases during the next two years before its business became deeply insolvent.
Plaintiff sued in September 1986 to collect about $40,000 that was owed on the notes. Proceedings against N-Sure were stayed when it filed for bankruptcy a month later.
N-Sure had serious cash flow problems throughout 1984 and 1985. By the end of 1985, it could not meet overhead expenses, pay creditors, or furnish its customers with updated software, thereby jeopardizing renewals of maintenance contracts with customers.
In late 1985, N-Sure's attorney wrote to plaintiff and other creditors proposing that they accept one share of stock for each dollar N-Sure owed. Most of N-Sure's creditors did not respond. Some responded unfavorably. N-Sure's attorney then proposed to the creditors the transfer of N-Sure assets to Businessland, Inc., discussed in detail hereafter.
Both of the attorney's letters are in evidence. Plaintiff's president denied receiving either letter before N-Sure transferred the assets to Businessland. Plaintiff's president said that Williamson gave him copies of the letters after the transfer, when he visited Williamson to collect payments on the notes. Plaintiff admitted in its appellate brief, however, that it received both "proposals":
Plaintiff made numerous collection efforts against the defendant N-Sure Systems, Inc., and received only proposals to receive shares in the corporation of N-Sure Systems, Inc. (P-11) and other proposals (P-12) regarding the transfer of the assets from N-Sure Systems, Inc. to another corporation.
Plaintiff learned that there apparently was a transfer of the assets from N-Sure Systems, Inc. to Businessland, Inc., but unaware of the specific facts, instituted suit against both corporations for the indebtedness under the Bulk Sales Act.
Businessland, Inc. was incorporated by Williamson in 1983 but was inactive and no stock issued until the end of 1985. Williamson then was issued 1,000 shares of Businessland stock in return for about $33,000 in furniture, fixtures and office equipment surrendered to him by N-Sure to satisfy unpaid rental obligations for office space leased from Williamson personally.
On December 31, 1985, N-Sure transferred to Businessland its rating software and associated copyrights, and its accounts receivable from its current customers. N-Sure had assigned its interest in the software and copyrights to Ouachita National Bank in January 1984 to secure past and future loans. The N-Sure loans were consolidated on December 13, 1985, when N-Sure signed a note in the principal amount of $560,000, secured by assignments of its accounts receivable and software rights, and by Williamson's personal endorsement and by his pledge of notes that were payable to him individually for the sale of his interest in other businesses.
In consideration for the transfer of the above mentioned assets, Businessland assumed the ONB note and agreed to service N-Sure's maintenance contracts and to pay *1032 N-Sure eight percent of the net profit from new software sales. Businessland also assumed about $5,500 in accounts payable to South Central Bell, UPS, and Safeco Insurance Co. The debts N-Sure owed to plaintiff and other unsecured creditors, totaling over $600,000, were not assumed by Businessland.
Businessland also acquired N-Sure's interest as lessee of the computer hardware necessary for business operations and agreed to pay future rent and the past due rent that was owed by N-Sure. Businessland occupied the same rented office space and had the same personnel and telephone number as N-Sure did before the transfer.
The only assets remaining on N-Sure's books after the transfer were accounts receivable of former customers that had proved to be uncollectible and some furniture and fixtures that N-Sure had overly depreciated. N-Sure's bankruptcy schedules listed $59 in assets.
Evidence of the value of the assets transferred to Businessland is scant. The act of transfer and Businessland's financial statements show a value of $750,000 for the "software license" and $250,000 for the "customer base."
The $250,000 figure represents the gross amount that would have been realized if all existing maintenance contracts were renewed. N-Sure's attorney testified that the company's good will was negligible at best because its customers were dissatisfied by N-Sure's failure to provide timely rate changes. The attorney opined that the only N-Sure asset with any real value was the software, and its value was conjectural because it became outdated so quickly.
The software value ($750,000) represented the estimated cost of overhead and programmers' time that would be necessary to recreate current software, and not the market value or income-producing potential of the software that was transferred. Williamson testified that the $750,000 figure was used for accounting purposes and to give Businessland a "reasonably healthy appearance" on paper in hopes of attracting investors.
Williamson first offered to sell N-Sure's business in 1984 for $300,000. He received no response other than two offers of unspecified amounts that were later rescinded. Williamson declined an offer of $90,000 for the assets, without the liabilities.
According to Williamson and as explained in the letter to creditors outlining the proposed transfer, N-Sure's debt structure made it impossible to refinance its loans or to sell the business. It was explained that if N-Sure simply went out of business and into bankruptcy, unsecured creditors would not be paid anything because other creditors had security interests in N-Sure's assets. The purpose of transferring the software, virtually the only income-producing asset, to Businessland was to allow existing contracts with customers to be serviced and additional financing to be sought with a "clean balance sheet." The eight percent "overriding royalty" payments to N-Sure on new sales made by Businessland that were to be used to pay N-Sure's creditors never materialized. By October 1986, Businessland showed a year-to-date net loss of about $54,000.

BULK SALES LAW
If a business subject to the Bulk Sales Law makes a bulk transfer of its merchandise, fixtures or equipment other than in the ordinary course of trade, without complying with the inventory and notice requirements of LRS 9:2962, the transferor's creditors have recourse against the transferee under § 9:2963.
While the Bulk Sales Law clearly applies to retail merchandising businesses, it has not been applied generally to businesses that primarily provide services. See Jim Durio Florist v. St. Landry Loan Co., 484 So.2d 228 (La.App. 3d Cir.1986); LaBorde v. W.W. II, Inc., 509 So.2d 816 (La.App. 1st Cir.1987); and Uarco, Inc. v. Peoples Bank & Trust Co. of St. Bernard, 414 F.Supp. 1219 (E.D.La.1976), affirmed, 545 F.2d 1297 (5th Cir.1977). Each of these cases declined to apply the law to the respective transfer of assets by a loan company, a nightclub, and a data processing business.
*1033 Each of the cited cases expressly disagrees with two 4th Circuit cases applying the law to hotel and restaurant businesses. Plaintiff's brief cites the 4th Circuit cases as authority for applying the law to service-providing businesses. See Servi-Clean Industries, Inc. v. Tonti Management Corp., 294 So.2d 580 (La.App. 4th Cir.1974), affirmed on other grounds, 336 So.2d 799 (La.1976); and Weiner's, Inc. v. Sunseri, 141 So.2d 162 (La.App. 4th Cir. 1962).
We follow the 1st and 3d Circuit cases and not the 4th Circuit. For the reasons stated in Jim Durio Florist, LaBorde, and Uarco, cited supra, we decline to hold as a matter of law, as plaintiff asks, that the Bulk Sales Law applies to businesses that primarily provide services. We consider only the factual issue whether N-Sure was a "retail merchandising business" as plaintiff contends.
The trial court found that N-Sure was engaged primarily in the service-oriented business of providing current rating information to insurance agents, notwithstanding evidence that it sold computer hardware and supplies such as printer paper to some of its customers. Williamson explained that N-Sure did not sell these products to the general public, nor to all of its agent-customers, but only to agents who ordered these products for use with N-Sure's rating software package.
N-Sure generally kept no more than five units of hardware on hand to fill customer orders, and had no display or demonstration area for the hardware in its office. N-Sure's salesmen demonstrated both the hardware and the software at a potential customer's office or at trade shows.
N-Sure was an authorized IBM dealer and on one occasion received a shipment of over 80 computers from IBM. It kept only enough for its own use and for filling customer orders. N-Sure sold the computers wholesale to a retail computer dealer who agreed to pay for them.
A significant portion of N-Sure's business involved servicing the maintenance contracts with agents, to whom the initial software package was of little use without updated information as rates were changed.
This record reveals no clear error in the trial court's finding that N-Sure was primarily a service-providing business and not a retail merchandising business. We do not disturb this finding. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).

OTHER RECOURSE AGAINST BUSINESSLAND
Plaintiff contends Businessland succeeded to all liabilities of N-Sure, even though it expressly assumed only some of them, because it acquired virtually all of the assets, continued N-Sure's business operations, and both corporations had the same officers and directors. Under similar circumstances, a successor corporation was held liable to the original corporation's creditor in Roddy v. Norco Local 4-750, 359 So.2d 957 (La.1978).
The Roddy plaintiffs brought tort claims against a nonprofit corporation, Independent Oil & Chemical Workers' Union of Louisiana, and obtained judgments totaling about $5,000. After the suit was filed, the defendant union requested and was granted a charter for a local union, Local 4-750, which acquired Independent's officers and membership. Independent then donated immovable property valued at $40,000 to Local 4-750. The property was apparently unencumbered.
The court found no evidence of fraud in the transactions but found they were prejudicial to plaintiffs on their face and that no satisfactory explanation had been offered to permit the assets, legally considered a trust fund for the payment of Independent's debts, to be placed beyond the reach of its creditors.
C.C. Art. 3183 provides:
The property of the debtor is the common pledge of his creditors, and the proceeds of its sale must be distributed among them ratably, unless there exist among the creditors some lawful causes of preference. Our emphasis.
As between a secured creditor and an unsecured creditor, the debtor's property is *1034 not the common pledge of both, because the secured creditor has a lawful cause for preference. See Martin Lebreton Ins. Agcy. v. Phillips, 364 So.2d 1032 (La.1978). There, the unsecured creditor tried unsuccessfully to revoke the debtors' dation en paiement of mortgaged property to the mortgagee. The court noted that the complaining creditor in a revocatory action must show injury or prejudice, in addition to the debtor's insolvency, and that the test for determining prejudice is factual, based on the value of the property and the ranking of the indebtedness. Because the preferred claims against the property exceeded its value, the dation was not revoked because it did not injure or prejudice the unsecured creditor. 364 So.2d at 1034. See also Deposit Guaranty National Bank v. Shipp, 232 So.2d 810 (La.App. 2d Cir.1970), writ not considered, and Franklin Press, Inc. v. National Diversified Corp., 286 So.2d 469 (La.App. 1st Cir.1973), writ denied.
Although Roddy v. Norco Local 4-750, supra, was not a revocatory action, liability was there imposed on the transferee corporation on a finding of prejudice to the transferor corporation's creditor. There were apparently no other creditors, secured or unsecured, with claims against the property that was transferred, and the property was worth considerably more than the $5,000 owed the plaintiffs.
Here the trial court found that the transfer of N-Sure's assets to Businessland did not prejudice plaintiff because the assets were fully encumbered to secure debts owed to other creditors. The record supports this finding, notwithstanding that the act of transfer recites $750,000 as the value of the software rights securing the $560,000 ONB note assumed by Businessland.
Williamson explained that the $750,000 figure represented the cost to recreate the software, and not the market value of the software when it was transferred. Williamson's inability to sell the business for $300,000, and the operating losses of both N-Sure and Businessland while using the software, logically suggest that the software's realistic value was much less than $750,000.
The ONB employee who was familiar with the $560,000 note was not asked whether or how the bank attempted to assess the value of the software rights. ONB held other security for the payment of that note. Although plaintiff contends that N-Sure assigned the software rights to ONB in 1984 without being asked to do so by the bank, suggesting N-Sure's intent to prejudice unsecured creditors, there is no evidence in this record to support that contention.
Before the transfer of assets in December 1985, N-Sure was insolvent and could not continue operating or pay its creditors. Had the software rights not been transferred to Businessland, both the value of and the prospect of deriving revenue from the software would have declined. Nothing would have been accomplished by transferring all of N-Sure's liabilities along with the assets. Businessland would then have been as insolvent as N-Sure.
When we consider the inconclusive evidence of the value of the software rights at the time of the transfer, and the evidence that the transfer was intended to salvage the business and generate some funds for paying the N-Sure debts that were not assumed by Businessland, we cannot find the trial court was clearly wrong in its conclusion that the transfer did not prejudice plaintiff. Plaintiff is not entitled to judgment against Businessland.

INDIVIDUAL LIABILITY
Plaintiff sought judgment against the Williamsons on allegations that both corporations were undercapitalized, and that neither observed basic formalities in keeping corporate books and records.
The Williamsons were the shareholders, principal officers, and directors of both corporations. Plaintiff alleged that they wasted corporate assets by making excessive payments to themselves or other corporations in which they had a controlling interest, and that the transfer of N-Sure's assets to Businessland constituted a breach *1035 of their fiduciary duty to N-Sure's unsecured creditors and an unlawful distribution of assets.
The trial court found the evidence insufficient to impose personal liability on any grounds.
Corporate stockholders are generally not individually liable for corporate debts but may incur liability if the business of the corporation is conducted with such disregard of corporate formalities that the corporation is indistinguishable from the stockholders. Factors to be considered include undercapitalization, ownership of all shares by a single stockholder, failure to maintain separate bank accounts and bookkeeping records, commingling of stockholder and corporate funds, and failure to hold regular stockholder and directors' meetings.
Proof of some factors tending to support the alter ego theory may not result in individual liability if the theory is negated by the totality of the facts and circumstances, including the creditor's willingness to contract with the debtor corporation as an entity distinct from its stockholders. See Abraham v. Lake Forest, Inc., 377 So.2d 465 (La.App. 4th Cir.1979), writs denied; and Kingsman Enterprises v. Bakerfield Elec. Co., 339 So.2d 1280 (La.App. 1st Cir.1976).
N-Sure was incorporated with about $30,000 in capital in 1977. An unspecified portion of the proceeds of the ONB loans that were consolidated in 1985 was used as additional capital. N-Sure originally had two stockholders besides Williamson but he became the sole stockholder during the time N-Sure dealt with plaintiff, beginning in late 1981.
Williamson was also the sole stockholder of Businessland when it first issued stock in 1985. He sold 40 percent of his stock to other family members in 1987. His initial $33,000 capital contribution to Businessland appears small considering the corporation's assumption of the $560,000 ONB note, but Williamson testified, and the bank records show, that Businessland never made any payments on the note.
From March 1986 through August 1987, Williamson paid ONB about $180,000 in principal and $100,000 in interest, from the proceeds from sales of property Williamson owned individually, including real estate and interests in other businesses.
Williamson candidly admitted that most of his corporations were "thinly incorporated." Abraham v. Lake Forest, Inc., supra, recognizes that the law allows individuals to limit their liability by setting up a minimally capitalized corporation, and allows a corporation to have only one stockholder. 377 So.2d at 468.
N-Sure and Businessland had separate bank accounts, bookkeeping records, and financial statements. These records contain appropriate entries documenting each corporation's receipts from and payments to Williamson and his other corporations.
Corporate minutes of the meetings held by each corporation in 1985 to authorize the transfer of assets, as well as minutes of the 1987 annual meeting of Businessland stockholders to consider various proposals of the board of directors, were introduced into evidence by plaintiff.
Plaintiff's president testified he understood that the notes for the balance due on N-Sure's account were given by the corporation. He accepted the notes with only the corporate signature after Williamson declined his request for an endorsement by Williamson personally or by another of his corporations.
The totality of the evidence shows that both corporations observed corporate formalities and maintained separate identities.
The record does not support plaintiff's claims that the Williamsons wasted corporate assets based on allegations that Williamson drew excessive salaries and charged both corporations excessive rent for space leased in a building owned by Williamson individually, and that Businessland funds were used to pay debts owed by Williamson individually or by other corporations in which he had a controlling interest.
Williamson was actively involved in the management and day-to-day operations of *1036 both corporations. He drew less than his $48,000 annual salary from N-Sure in the years 1981-1983, and drew only $17,000 in 1985 for both salary and repayment of personal funds loaned to the corporation. His salary with Businessland was also to be $48,000 per year, but he drew only $15,000 for both salary and loan repayments in 1986. He received a few checks of unspecified amounts in the first half of 1987 but drew no compensation from Businessland between June 1987 and the trial three months later.
Mrs. Williamson was not involved in the day-to-day operations of either corporation and was not paid a salary. She received about $4,000 from N-Sure in September 1985 in repayment of a loan she made to the corporation with personal funds.
The office space used by N-Sure and Businessland was located in a building personally owned by the Williamsons. Williamson leased space in the building to corporations in which he owned an interest and to tenants with whom he had no connections. He testified each tenant was charged $10 per square foot and said the differences in rental payments made by the various tenants arose from differences in the amount of space leased and in the apportionment of maintenance expenses between him and each tenant. He denied charging his corporations higher rent than he charged others for comparable space and services.
Although there was testimony that employees of other corporations owned by Williamson received paychecks from Businessland, both Williamson and Businessland's bookkeeper explained that Businessland was reimbursed by the other corporations for their proportionate share of the payroll expense and that the disbursements were made by Businessland because it had the greatest number of employees. They denied that Businessland paid employees of other corporations without receiving either services from the employee or reimbursement from the employer.
Both also testified that although Williamson used Businessland's credit card for both business and personal expenses, the corporation paid for only the business portion of the charges and Williamson paid the personal portion with his own funds.
Williamson denied using corporate funds to pay personal or unsubstantiated business expenses. The bookkeeper for N-Sure and Businessland, as well as an accountant who worked for another of Williamson's corporations, knew of no instances where Williamson withdrew, or authorized payment of, corporate funds without a proper accounting or for a purpose that was other than a legitimate business-related transaction.
Plaintiff further contends that the value of furniture and fixtures that N-Sure surrendered to Williamson to satisfy its unpaid rental obligations exceeded the amount of the unpaid rent. Williamson testified on cross-examination that the surrender of assets satisfied all but about $1,000 of the debt. Williamson valued this property at about $33,000 in December 1985.
N-Sure's bankruptcy schedules in October 1986 show that property valued at $18,133 was seized by Williamson to satisfy $21,266 in unpaid rent. Williamson was listed as an unsecured creditor for $4,250 in unpaid rent. He was not asked at trial to explain or relate these 1986 figures to the 1985 figures.
On this record, plaintiff has not proved that Williamson was transferred assets worth more than N-Sure's past due rent. Williamson was entitled to the lessor's privilege on these assets.

CONCLUSION
We have found that the transfer of assets was not a scheme to defraud creditors but was an attempt, albeit unsuccessful, to salvage the declining business and generate some funds to pay N-Sure's unsecured creditors.
There is no evidence that the Williamsons derived personal financial benefit from the transfer, as plaintiff argues. The primary asset, the software, was not transferred to them, but to another corporation that assumed the debt secured by the software. The transfer did not allow the Williamsons *1037 to avoid personal liability for that debt because they had already personally endorsed the note and made substantial payments on the note after the transfer.
With or without the transfer, N-Sure's assets would have been exhausted by claims of secured creditors. The evidence does not show that the Williamsons, as officers and directors, breached their fiduciary duty to unsecured creditors or unlawfully distributed corporate assets by approving the transfer. Compare factually Abraham v. Lake Forest, Inc. and Franklin Press, Inc. v. National Diversified Corp., cited above in our discussion of other issues.
We find no error in the judgment.

DECREE
At plaintiff's cost, the judgment is AFFIRMED.