GARRETT, J.
|; This litigation arises from a family dispute over an unpaid debt. The plaintiffs, David and Linda Dorries, are seeking to execute on a deficiency judgment against Linda’s brother, Edward Earle Linder (“Earle”), by seizing and selling at sheriffs sale his interest in immovable property located in Claiborne Parish. Earle claimed to have sold the property to a third party, who later intervened in the suit. Both sides appeal from a trial court judgment which upheld an injunction in favor of Earle and the intervenor, enjoining the seizure and sale of the property until the intervenor’s alleged ownership could be adjudicated. The judgment then fully adjudicated the ownership claim by granting a revocatory action on behalf of the plaintiffs and annulling Earle’s sale to the. intervenor. Earle and the intervenor contend that the trial court erred in annulling their transaction and that the intervenor acquired the property free and clear of the plaintiffs’ judicial mortgage. The plaintiffs agree with the ruling on their revocatory action, but also seek relief on some matters not ruled upon below and argue the trial court should not have assessed them half of the court costs. Both sides claim they are entitled to damages and attorney fees. For the reasons set forth below, we affirm the trial court judgment in part and reverse in part.
FACTUAL AND PROCEDURAL BACKGROUND
What began as a simple executory process lawsuit has now spun totally out of control due to the actions of Earle in failing to repay an obligation he clearly owed. In order to understand the chain of events leading up to the judgment that is now before us, some background information is necessary.
12Linda Linder Dorries, Earle Linder, and Randall Ray Linder are the children of R.B. Linder and Bobbie Ray Linder. In April 2003, the parents created a revocable inter vivos trust in which they designated themselves as the settlors, the sole income beneficiaries, and the trustees. Among other assets, several tracts of immovable property were placed in the trust by an act of donation. They included tracts in Claiborne Parish, one of which contained the parents’ residence and another containing what was known as “the yellow house.” Several of these tracts were located close to Lake Claiborne. The original act of donation involving the immovable property contained almost five single-spaced, legal-size pages of very complicated property descriptions.
Over time, the trust documents were amended on several occasions. The original trust document provided that, upon the death of the settlor last to die, the principal of the trust and all undistributed income “shall be immediately distributed” to the three Linder children in equal portions. It also initially provided that, after the deaths of both parents, Earle was to be temporary successor trustee for “the *1245 single purpose of winding up the affairs of this trust and making the final distribution of the corpus thereof to the principal beneficiaries.” In a 2006 amendment, Earle and Randall were named temporary successor co-trustees for the same purpose.
The father died on November 13, 2010. In March 2012, the mother amended the trust to give a right of first refusal to purchase the property containing the parents’ home to Randall and “the Hatfield lot”[1] to Earle. It also provided that upon her death, the trust would terminate “as soon as is treasonable.” It further stated that, subject to the rights of first refusal, the remaining principal, income from the sale of the two tracts, and all undistributed income “shall be immediately distributed to ... children of Settlors, in equal proportions to each, free of trust.” In August 2013, the mother resigned her position as trustee due to her declining health and appointed Earle and Randall as successor trustees. The last amendment to the trust was made in May 2014. The mother expressly revoked the 2012 amendment and the right of first refusal given to Earle for the Hatfield lot. However, Randall’s right of first refusal on the parents’ residence was maintained. The amendment stated that “[u]pon the death of the second settlor to die the trust shall be terminated as soon as is reasonable.” This amendment included language that, subject to Randall’s right of first refusal, “the remaining principal of this trust, income from the sale of the above tract, and all undistributed income shall be immediately distributed” to the three children “in equal proportions to each, free of trust, except that [Earle’s] share shall-be reduced by $12,000.” The mother died on July 9, 2014. As explained below, the immovable property remaining in the trust was not transferred by the trustees to the Linder children until January 2015.
Over the years, Linda and her husband, David, had loaned a substantial amount of money to Earle. The debt was evidenced in two promissory notes: a 2011 note for $115,000 and a 2012 note for $25,000. Earle secured the loans with a mortgage on two tracts of property he owned near Lake Claiborne. After Earle failed to repay them, the Dorrieses filed a petition for executory process on December 13, 2013. The property mortgaged by Earle was seized and sold, with benefit of appraisal, at sheriffs sale to the Dorrieses for $76,533.33, on February 12, 2014.
|4On July 16, 2014, the Dorrieses filed a petition for a deficiency judgment in the amount of $79,585.59, as of February 12, 2014, plus interest, and attorney fees of 15% of the amount due on November 5, 2013. Earle, acting in proper person, filed a general denial answer on August 1, 2014.
The Dorrieses then filed a motion for summary judgment, which was set for hearing on October 2, 2014. After the sheriff was unsuccessful in serving Earle, a private process server was appointed, who eventually located him. Paul Kitchens, as Earle’s counsel, filed an answer, an opposition to the motion for summary judgment, and a motion for continuance which asserted that Earle was domiciled in California. Over the Dorrieses’ objections, the continuance was granted, and the matter was reset for November 3, 2014. The Dorrieses also responded to’ the opposition.
On November 3, 2014, the trial court granted the plaintiffs’ motion for summary judgment in open court and awarded them a deficiency judgment of $79,585.59, with interest, plus attorney fees of $22,312.50. At the conclusion of the hearing, Paul Kitchens filed a motion to withdraw as Earle’s counsel of record. However, he agreed to sign the judgment on the motion *1246 for summary judgment when it was prepared. The trial court granted his motion and signed the judgment allowing him to withdraw. Judgment in conformity with the trial court’s ruling on summary judgment was signed on November 18, 2014. This judgment was recorded in the mortgage records of Claiborne Parish on November 26, 2014.[2]
Un the meantime, on November 4, 2014, Paul Kitchens notarized a cash sale deed whereby Earle purported to sell his interest in certain immovable property to X-Sell Properties, LLC, a Colorado company, for $25,000. The document had already been executed by X-Sell’s manager, Vicki Schmidt, on October 31, 2014, before a notary public in Arizona. The deed recited that no title opinion had been performed or requested and that the parties furnished the legal description. A lengthy, detailed—and very confusing—description of the property being sold was attached to the deed as an exhibit. While the property descriptions appear generally to track those in the 2003 original act of donation transferring the Linders’ property to the trust, the descriptions contained numerous errors and included property no longer owned by the trust. In addition to the property near Lake Claiborne, the list of property sold to X-Sell by Earle included interests in two other Claiborne Parish tracts and mineral rights to property in Claiborne Parish and Arkansas. The appearance clause recited that Earle lived in California. The cash sale deed was recorded in the conveyance records of Claiborne Parish on November 5, 2014.
The Dorrieses sought to collect on their deficiency judgment against Earle. Since he had moved to California and was supposedly no longer represented by Paul Kitchens, they requested a writ of attachment, based upon Earle being “a nonresident who has no duly appointed agent for service of process within the state,” pursuant to La. C.C.P. art. 3541. They sought to attach Earle’s interest in property that had been in the name of the Linder parents’ trust, which included a checking account, bank stock shares, immovable property, and mineral rights. The writ of attachment was granted on December 22, 2014.
| (¡On January 9, 2015, Earlé—again represented by Paul Kitchens—filed both a petition for declaratory judgment and a motion seeking dissolution of the writ of attachment. He claimed that the issuance of the writ of attachment violated a spendthrift clause in the trust and Louisiana law. Although he had alleged that he was domiciled in California in his earlier motion for continuance, he now asserted that he was only “temporarily domiciled in California,” thus making issuance of the writ of attachment improper. He requested attorney fees and court costs.
In response, the Dorrieses cited the recent transfer deed from the trustees of the Linder parents’ trust to the beneficiaries, which had been filed in the Claiborne Parish conveyance records on January 20, 2015. The document was executed by all three of the Linder children, including Earle, who again recited that he was a resident and domiciliary of California. The deed transferred to each child an undivided one-third interest of several tracts of land in Claiborne Parish, as well as mineral rights to property in Claiborne Parish and Arkansas, a party barge, and stock. Many of the property descriptions in this document differed from those in the original 2003 act of donation due to subsequent alienations of portions of the property and *1247 also because of updated and more precise descriptions developed pursuant to 2014 surveys of the Lake Claiborne tracts.[3] The document also excepted certain property from the transfer—the property to which Randall had been given right of first refusal,[4] and two tracts sold to |7the Dorrieses in 2012.[5] The transfer document consisted of 14 pages, which included several surveys and is rather complex, to say the least.
On February 6, 2015, Paul Kitchens executed a document entitled “Notarial Act of Correction,” which referenced the cash sale deed between Earle and X-Sell that he notarized on Earle’s behalf on November 4, 2014. The document recited that “inaccuracies” were included in the property descriptions and purported to correct these mistakes. It appeared to track the new property descriptions found in the January 2015 transfer deed from the trustees to the beneficiaries. The act recited that Earle was not the record owner at the time of the recordation of the cash sale deed, and then asserted the application of the doctrine of after-acquired title to attempt to cure title issues. This document was not executed by either Earle or X-Sell—only by one of the two notaries to the original deed, pursuant to La. R.S. 35:2.1. The “Notarial Act of Correction” was notarized by Graydon Kitchens, Jr., a member of the same law firm.
The Dorrieses continued their efforts to collect their deficiency judgment, as Earle tried to thwart them. The Dorrieses agreed not to pursue the writ -of attachment. However, on March 2, 2015, a writ of fieri facias was issued seizing Earle’s right, title and interest in his mother’s succession.
A judgment debtor examination was held on March 9, 2015. The judge who presided over the trial in this matter also presided over the judgment debtor exam. Earle did not bring all the financial documents requested by the Dorrieses. He testified that in the summer of 2014, he received $140,000 from his parents’ trust and that he had spent all but $300 Rof it on “traveling, normal business expenses, ... normal household expenses, gambling.” He could not provide a detailed description of where the money went. He also admitted that he had sold for “$10.00 and other valuable considerations” a tract of property in Arizona which he had purchased for about $500,000. Earle was ordered to produce certain financial documents when the examination resumed on May 4, 2015. From the record before us, it does not appear that another judgment debtor exam was conducted.
On April 24, 2015, Earle filed a motion for dissolution of the writ of fieri facias pertaining to his mother’s succession, as well as attorney fees, damages and a permanent injunction. He asserted that the property sought by the Dorrieses was actually still owned by the family trust. By consent judgment signed on- June 25, 2015, the parties agreed that, if the trust still *1248 existed, any property it owned was excluded from this writ of fieri facias.
On June 8, 2015, the Dorrieses requested a writ of fieri facias to seize and sell the tracts of immovable property which Earle had allegedly transferred to X-Sell. On June 15, 2015, the Dorrieses filed a motion for appointment of an attorney, pursuant to La. C.C.P. art. 2293, for service of a writ of fieri facias to X-Sell. The description of the properties to be seized utilized the newer property descriptions from the 2014 surveys and tracked the language of the January 2015 transfer deed. The properties were the tract containing the yellow house; the 50-foot lakefront tract; a 100-acre tract and a 120-acre tract, both in Claiborne Parish [6]; and mineral rights to a 40-acre tract in Claiborne Parish.
InOn July 15, 2015, X-Sell—represented by the same law firm as Earle—filed a petition of intervention captioned as a “Motion for Dissolution of Writ of Fieri Facias, for Injunction, and for Attorney’s Fees and Damages.” Earle was also a party to this pleading, which was filed on behalf of him and X-Sell by Graydon Kitchens. X-Sell asserted that it had obtained all of Earle’s interest in certain immovable property in Claiborne Parish under the doctrine of after-acquired title and that the judicial mortgage recorded on November 26, 2014, never attached to or encumbered the property. The sale of the property scheduled for August 5, 2015, was enjoined by the trial court, pending adjudication of X-Sell’s claim of ownership.
In their answer to the petition of intervention, the Dorrieses asserted that Earle had no interest in the immovable property at issue at the time he purported to sell it to X-Sell. Also, the property descriptions in the purported sale were incorrect and had to be corrected in February 2015. They maintained that their November 2014 judicial mortgage recorded against Earle attached to the property he acquired from the trust in January 2015 and continued to do so. In a reconventional demand, they asserted a revocatory action under La. C.C. art. 2036 and requested that the purported sale to X-Sell be annulled. The Dorrieses requested dissolution of the injunction, as well as attorney fees and costs.
A trial was finally held on November 5, 2015.[7] Although the proceedings were supposed to be limited to issues susceptible to summary disposition, the trial court elected to hear all issues as a matter of judicial economy and courtesy to the parties who lived out-of-state—Earle in |inCalifornia and Ms. Schmidt, X-SeU’s managing broker, in Colorado. The parties acquiesced in this procedure and thus all issues were before the court. The parties stipulated that the value of Earle’s portion of the disputed property in Claiborne Parish was $66,406.[8] Numerous documents and exhibits were admitted into evidence, including trust documents and amendments, deeds, and financial records.
Extensive evidence was taken on Earle’s finances, specifically his bank records, which will be discussed in detail infra. Additionally, Earle denied giving Ms. Schmidt money before or after executing the cash deed to her. However, he admitted that he made many large cash withdrawals in that time period. He explained the process by which he came up with the *1249 $25,000 sale price in the cash deed. Since he had once had a right of first refusal to buy the yellow house for $40,000, he came up with $50,000 “just off the top of my head” for all of the property he was selling her. Since it was undivided property, he then divided that price by half.
The testimony established that Earle and Ms. Schmidt, a real estate broker, were childhood friends. She admitted that she relied upon what Earle told her about the property; that she was unaware that he did not own it at the time of the sale; that she had neither a title opinion nor an appraisal done on the property; and that she thought the property sounded “very interesting for $25,000.00.”[9] Ms. Schmidt testified that she would not have bought the property had she known Earle did not own it. When asked if |nEarIe was paying her legal fees in the current litigation, she replied that she did not know, but she had not been billed for any such fees. At the conclusion of the hearing, the matter was taken under advisement and the parties submitted post-trial briefs.
On February 4, 2016, the trial court issued detailed written reasons for judgment, and a judgment prepared by the trial court was signed that same day. The court found that the injunction it granted against the seizure and sale of the property until a decision was made about X-Sell’s ownership was not improper even though no bond was posted. It found that, under the after-acquired title doctrine, X-Sell acquired the property at issue. Because notice of the writ of fieri facias identified both Earle and X-Sell as parties to be notified, the writ obtained by the Dorries-es was not defective as to proper notification. The court also found that the Dorries-es acted in good faith in seeking the writ, so the writ request was not defective on the basis of bad faith.
As to the revocatoiy action filed by the Dorrieses, the trial court conducted an exhaustive analysis of the bank records. The court found that the financial evidence demonstrated that, at the time the deficiency judgment was granted on November 3, 2014, Earle was insolvent. Furthermore, his purported sale on November 4, 2014, to X-Sell for $25,000—which was $41,406 less than the property’s stipulated appraised value—increased his insolvency. The court specifically found that Earle’s testimony completely lacked credibility. In particular, the court noted that his testimony that he intended to repay his sister and brother-in-law when he had the money was contradicted by his bank records, which proved that he had the funds earlier in October 2014. Having found that the plaintiffs carried their burden of 112proof on the revocatory action, the court annulled the deed from Earle to X-Sell. It ordered that the entire value of the property should be returned to the Dorrieses, pursuant to La. C.C. art. 2043.
The trial court noted that all parties sought attorney fees, and that Earle and X-Sell also sought damages. As none of the parties presented any evidence on these issues, the trial court concluded that they had abandoned these claims.
Because the issue of X-Sell’s ownership of the property was fully adjudicated by the court’s decision to annul the transaction between Earle and X-Sell, the court found that the injunction previously issued on the writ of seizure and sale dissolved by its own terms. The court also held that “all other issues” raised by the parties were denied.
*1250 Since the trial court found in favor of Earle and X-Sell on the propriety of their injunction and in favor of the Dorrieses on the revocatory action, the court ordered the Dorrieses to pay one-half of court costs while Earle and X-Sell were to pay the other one-half.
For reasons that are unclear, the trial court did not specifically address whether the Dorrieses’ judgment recorded in the mortgage records on November 26, 2014, attached to the property eventually acquired by X-Sell. The court may have determined this was unnecessary since the sale was annulled by the successful revoca-tory action.
Both sides appealed and presented numerous arguments centering on the revo-catory action, the effect of the judicial mortgage, the injunction, attorney fees, and costs. Because the primary issue before us is the revocatory action, we will address that matter first.
|1SREV0CATQRY ACTION

Law

A revocatory action is one where an obligee seeks to annul an act of an obligor, or the result of a failure to act, that is made or effected after the right of the obligee arose and that causes or increases the obligor’s insolvency. La. C.C. art. 2036; Dortch v. Rollins, 50,170 (La.App. 2d Cir. 12/9/15), 181 So.3d 911. In order for an obligee to annul an act of the obligor, he must show: (1) an act (or failure to act) of the obligor that causes or increases the obligor’s insolvency; and (2) the act must occur after the obligee’s rights arose. Parish Nat. Bank v. Wilks, 2004-1439 (La.App. 1st Cir. 8/3/05), 923 So.2d 8. The existence of the debt and insolvency of the debtor are the two prerequisites to revocation of the transaction. Reading & Bates Const. Co. v. Baker Energy Res. Corp., 96-1276 (La.App. 3d Cir. 5/21/97), 698 So.2d 413, writ denied, 97-2548 (La. 1/16/98), 706 So.2d 976. An obligor is insolvent when the total of his liabilities exceeds the total of his fairly appraised assets. La. C.C. art. 2037. Additionally, the jurisprudence requires that the obligee must prove prejudice, injury, or damage to the obligee as a result of the act. Dortch v. Rollins, supra.
The test for determining prejudice or injury is factual, based on the value of the property and the ranking of the indebtedness. Central Business Forms, Inc. v. N-Sure Systems, Inc., 540 So.2d 1029 (La.App. 2nd Cir. 1989); Dortch v. Rollins, supra.
A revocatory action in Louisiana is granted only to a creditor prejudiced at the time by a transfer. Premier Bank, Nat. Ass’n v. Stout, 627 So.2d 188 (La.App. 3d Cir. 1993).
| uThe effect of the revocatory action is that the attacked transaction is annulled only insofar as annulment will benefit the complaining creditor, and the returned property is applied to the payment of that creditor. See La. C.C. art. 2043, comment (b).

Discussion

We note at the outset that Earle complains about the trial court’s unfavorable credibility determination against him. However, credibility is the province of the trial judge. Hibernia Nat. Bank in New Orleans v. Johnson, 438 So.2d 1338 (La.App. 4th Cir. 1983), writ dism., 441 So.2d 209 (La. 1983), and writ denied, 443 So.2d 581 (La. 1983). An appellate court may not set aside a finding of fact by a trial court in the absence of manifest error or unless it is clearly wrong. Further, where there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on appeal. Hollier v. Brookshire Grocery Co., *1251 45,551 (La.App. 2d Cir. 9/29/10), 48 So.3d 1129.
Our review of the record fully supports the trial court’s dim view of Earle’s credibility. Extensive evidence was, taken on Earle’s finances at the November 2015 hearing. His statements from a Louisiana bank were introduced into evidence, as were those from an account he opened at a California bank in October 2014. These records proved that, prior to the sale at issue here, Earle had substantial funds with which to pay his indebtedness to the Dorrieses, but the funds then disappeared under questionable circumstances.
The evidence established that Earle received checks for $82,986.69 and $4,000 for his third of the trust’s Argent account. He cashed the smaller check. After depositing the larger check into his Louisiana account on |1sOctober 7, 2014, Earle withdrew $25,000 two days later. Earle received a check for $66,667.67, dated October 24, 2014, when Randall exercised his right of first refusal to purchase their parents’ home. Earle deposited $58,666.67 of these funds into his Louisiana checking account on October 27, taking $8,000 as cash.
On October 27, 2014, four days before Ms. Schmidt signed the cash sale deed in Arizona, and prior to the rescheduled hearing on the motion for summary judgment, Earle had a balance of $101,336.62 in his Louisiana bank account. He then began bleeding out the account, first with withdrawals of $8,000 on October 28, $15,400 on October 30, and $75,000 on October 31, 2014. As a result of all of Earle’s various debits, the daily balance in the Louisiana account had fallen to $463.35 on the day that Ms. Schmidt signed the cash sale deed. Thus, combined with the $22,470.35 in his California bank account, Earle had a total balance of only $22,933.70 on the day that Ms. Schmidt signed the cash sale deed. On November 3, 2014, when the summary judgment was granted in open court against him, his bank statements showed daily balances of $373.15 for the Louisiana bank and $22,361.56 for the California bank, or a combined balance of $22,734.71. On November 4 and 5, 2014, when he executed the cash deed and the document was recorded, his two bank accounts had a combined balance of $22,392.21. From that point on to the judgment debtor exam in March 2015, when he. indicated that he had spent all of the $140,000 he received from the trust, the balances were generally in decline.[10]
11fiWhen confronted .with his failure to pay his debt to the Dorrieses when he had ample assets to do so, Earle, initially claimed-that he did not pay because they were “still in negotiations and everything.” He then admitted that he didn’t pay it because “I just—I didn’t pay it.” He conceded that he had never paid anything on the judgment voluntarily. He said he did not recall making a statement that he “would spend everything” he had before he would ever pay the judgment.
At trial, Earle reiterated his testimony from the judgment debtor rule that all of the more than $140,000 he had received from the trust was gone, as well as his meager explanations for the disappearance of the funds, which included gambling. He insisted that all his money was gone, that ah he had was a monthly Social Security check for $1,458, and that his attorney fees were being funded by a friend in Arizona.
*1252 The evidence indicates that Earle was determined not to repay his debt to his sister and brother-in-law and that he took extreme measures to further this intent. While large deposits from disbursement of trust property were made into his bank account, equally large sums in cash were withdrawn and disappeared into a financial abyss without any of these funds ever being applied toward paying his substantial debt to the Dorrieses.
At the time of the sale to X-Sell, Earle had a combined balance of less than $23,000 in his bank accounts. Like the trial court, if we add the stipulated value of $66,406 for his share of the trust property, we conclude that Earle had less than $90,000 in identifiable assets. In view of the debt of more than $100,000 owed to the Dorrieses, we agree with the trial court that Earle was insolvent, that the sale to X-Sell increased his insolvency, and that the Dorrieses proved their revocatory action.
| ^Accordingly, we affirm the portion of the trial court judgment granting the revo-catory action in the Dorrieses’ favor.
PROPRIETY OF INJUNCTION/EFFECT OF JUDICIAL MORTGAGE
Althpugh we are affirming the lower court’s ruling on the revocatory action, we will also address an issue not answered below, as the parties are completely at odds on the resolution of this matter. Did the judicial mortgage recorded by the Dor-rieses on November 26,2014, attach to and encumber the property acquired by X-Sell? We believe this issue needs to be answered for two reasons. If our ruling on the revocatory action is somehow incorrect, the practical outcome of the case is the same if the judicial mortgage attached because the Dorrieses can still proceed with the sheriffs sale under our law. The issue also has bearing on the dissolution of the injunction.
At issue before us is the propriety of the injunction obtained by Earle and X-Sell. The Dorrieses sought to utilize a writ of fieri facias to seize and sell the immovable property described in that writ. Earle and X-Sell then obtained an injunction, contending that Earle had sold the property to X-Sell and that, by virtue of the after-acquired title doctrine, X-Sell was the owner of the property. Earle and X-Sell contend that the Dorrieses’ judicial mortgage did not ever attach to the property. The Dorrieses maintain otherwise. We resolve this matter in favor of the Dorrieses.

Judicial Mortgages

A judicial mortgage secures a judgment for the payment of money. La. C.C. art. 3299. A judicial mortgage is created by filing a judgment with the recorder of mortgages. La. C.C. art. 3300.
11sRecordation creates the mortgage as a right in favor of the creditor and establishes it over the property then owned by the debtor. If the debtor does not then own property, the mortgage exists as a right in favor of the creditor to a mortgage over the future property of his debtor, and is then imposed (established) over particular property when the debtor acquires it. Consequently, although such mortgages take their effect as to third persons from the time of recordation, they do not constitute a charge upon any particular property until it is acquired by the debtor. Comment, La. C.C. art. 3300.
Judicial and legal mortgages are general mortgages. They are established over property that the obligor owns when the mortgage is created and over future property of the obligor when he acquires it. La. C.C. art. 3303.
A legal mortgage, after judgment on the original obligation has been obtained, a *1253 judicial mortgage, or a conventional mortgage may be enforced without reference to any alienation or transfer of . the mortgaged property from the original debtor, and the creditor may cause the property to be seized and sold as though it were still owned by the original debtor and in his possession. La. C.C.P. art. 3741.
When property subject to a legal or a judicial mortgage is no longer owned by the original debtor, the seizing creditor shall cause notices of the seizure to be served by the sheriff upon both the original debtor and the present owner. La. C.C.P. art. 3742.

After-Acquired, Title Doctrine

The only person capable of conveying title to property is the owner. See La. C.C. art. 2452. However, when a vendor sells property which he 11fldoes not own and later acquires title, ownership immediately vests in the buyer. This jurisprudential concept is known as the doctrine of after-acquired title. Mayo v. Simon, 94-590 (La.App. 3d Cir. 11/2/94), 646 So.2d 973, It is well established in Louisiana. Lamson Petroleum Corp. v. Hallwood Petroleum Inc., 2000-695 (La.App. 3d Cir. 1/31/01), 824 So.2d 1194.

Notarial Act of Correction

As to the act of correction which was recorded in this case, La. R.S. 35:2.1 provides, in relevant part:
A. (1) A clerical error in a notarial act affecting movable or immovable property or any other rights, corporeal or incorporeal, may be corrected by an act of correction executed by any of the following:
(a) The person who was the notary or one of the notaries before whom the act was passed.
[[Image here]]
B. The act of correction executed in compliance with this Section shall be given retroactive effect to the date of recordation of the original act. However, the act of correction shall not prejudice the rights acquired by any third person before the act of correction is recorded where the third person reasonably relied on the original act. The act of correction shall not alter the true agreement and intent of the parties.

Discussion

At the outset, we address the issue of when the ownership of the immovable property remaining in the trust after the mother died vested in the Linder children. This is relevant to the question of whether, at the time of the purported sale in November 2014, Earle owned the property. We find that, under the circumstances presented by this case, he did not own it at that time.
, By the express terms of the trust documents and amendments, the trust was to terminate “as soon as is reasonable” after the death of the mother, |20who was the “second settlor to die.” The trust documents further contemplated a “winding up” of the trust’s affairs in order to make the final distribution, to the principal beneficiaries. The trust amendments established a right of first refusal which Randall was entitled to exercise, a decision he did not have to make until after his mother’s death. Due to the complexity of the virtually indecipherable property descriptions of the trust’s real estate holdings, further complicated by sell-offs over the years, the trustees obviously found it. necessary to commission surveys of .certain remaining tracts. According to the dates on the surveys, these were not completed until early December 2014. Consequently, we find that the trust, insofar as the immovable property was concerned, was not terminated until the execution of the January 2015 transfer deed, as obviously contemplated *1254 by the trust documents and the parties.[11] Accordingly, Earle did not have record title or ownership at the time he executed the cash sale deed to X-Sell on November 4, 2014.[12]
Although Earle did not own the property at the time of the sale, once the immovable property was transferred by the trustees to the Linder children in January 2015, X-Sell arguably became the owner of the property 12iat that time under the after-acquired title doctrine.[13] However, the Dorrieses’ judicial mortgage had already attached to the property.[14] This mortgage was recorded on November 26, 2014, and preceded the transfer deed of January 20, 2015. Consequently, the Dorrieses were entitled to pursue the property for collection of their debt under La. C.C.P. arts. 3741 and 3742.[15]
Based upon the above, we conclude that the Dorrieses acted properly in seeking their writ of fieri facias against both Earle and X-Sell. The injunction which was issued then prevented the seizure and sale so that the trial court could consider and resolve the issues of ownership. In hindsight, the injunction was improperly issued because all of the arguments urged by Earle and X-Sell have now been rejected. However, at the time it was issued, these matters were unresolved. Like the trial court, we find that the injunction is now dissolved, and the Dorrieses can proceed with the seizure and sale.
ATTORNEY FEES AND COSTS
Both sides complain about the failure of the trial court to award any attorney fees and damages. For the reasons *1255 stated above, Earle and X-Sell certainly are not entitled to any attorney fees or damages. Like the trial court, we note that no evidence was put forth on the issues of attorney fees 122and damages. Accordingly, insofar as the Dorrieses are concerned, we are constrained to find a failure of proof on these issues.
As to the assessment of court costs, we find that the trial court erred only insofar as it assessed a portion against the Dor-rieses. While it was appropriate at the time to grant Earle and X-Sell’s injunction for the very limited purpose of pausing the proceedings to allow resolution of the ultimate issue, i.e., ownership of the disputed property and appropriateness of the legal process to satisfy their judicial mortgage, these issues have been determined in favor of the Dorrieses. Consequently, no court costs should have been assessed against them, and we conclude that the trial court abused its discretion in so ordering.
CONCLUSION
The trial court judgment is affirmed insofar as it granted judgment in favor of the plaintiffs, David and Linda Dorries, on the revocatory action. The injunction is now deemed dissolved, and the plaintiffs shall proceed with judicial sale of the property. We also hold that the Dorrieses’ judicial mortgage attached to the property at issue. We reverse the trial court judgment insofar as it assessed costs against the plaintiffs.
Costs of this appeal are assessed to the defendant, Edward Earle Linder, and the intervenor, X-Sell Properties, LLC.
AFFIRMED IN PART AND REVERSED IN PART.

. The record indicates that this property was also known as 'The yellow house.”

. Counsel for the Dorrieses brought a prepared judgment to the hearing. However, Paul Kitchens pointed out errors in the numbers. Consequently, counsel for the Dorrieses stated that he would revise the judgment and mail it to Paul Kitchens.

.The surveys included descriptions for the tract containing ’ the parents’ house (which consisted of tract A-l and a portion of tract A-4 of the original act of donation); tract 1, which showed the property bought by the Dorrieses in 2012 and discussed in footnote 5; tract 2, where the yellow house was located and which included a portion of tract Ar5; and tract 3, the waterfront property, containing the portions of tracts A-5 and B-l fronting on the lake.

. According to the accompanying survey documents, this sale included tract A-l and a portion of tract A-4 from the 2003 act of donation.

. These were tracts B-l and B-2 of the original act-of donation. However, in the sale to the Dorrieses, the trust had retained a 50-foot section of B-l fronting on the shore of Lake Claiborne.

. Because these properties were owned with other persons, Earle’s undivided interest in these two tracts were, respectively, only 13.333 percent and 6.667 percent.

. Earle and X-Sell were represented at this hearing by Graydon Kitchens.

.The disputed property was described as the lakefront parcel, the yellow house parcel, the 100-acre parcel, and the 120 acre-parcel. We note that the value of the Louisiana and Arkansas mineral rights sold to X-Sell was not included in the $66,406.

. On cross-examination, she denied having an agreement with Earle to sell the property back to him. When asked if she would tell the court that she would never sell it to him, she responded, "Is that something I need to do?” She then stated that it was not in her plans right now, but never was a long time, and she didn't know if she would sell it back to him.

. Between October 2014 and February 2015, Earle made sporadic deposits into the California bank account. The record does not satisfactorily establish the sources of all these funds, most of which then swiftly exited the account in cash withdrawals to Earle. On the date the transfer deed was recorded in January 2015, he had a combined balance of only $9,882.39 id his accounts.

. Although not cited by any party, we note that since the termination of this trust, the legislature enacted La. R.S. 9:2029.1, which provides:
If a trust owns immovable property at the time the trust terminates and the date of termination is not discernable on the face of the recorded trust agreement or extract of trust, the termination shall not cause the dispositive provisions of the trust to have their ultimate effect insofar as third persons are concerned until an act evidencing such termination has been recorded in the conveyance records of the clerk of court of the parish in which the immovable property is located.
The statute became effective August. 1, 2015. The only reported decision addressing it is In re D'Anna, 548 B.R. 155 (Bankr. E.D. La. 2016). In that case, the bankruptcy court held that the statute was not retroactive.

. We cannot help but note that even the "Notarial Act of Correction” stated that Earle was not the record owner when the deed to X-Sell was recorded, but became the record owner when the trustees transferred the properties.

.The parties in this case appear to agree on this, and thus this is not really an issue before

. At oral argument, counsel for Earle and X-Sell cited Bank of St. Charles v. Alloy & Steel Fabricators, Inc., 643 F.Supp. 206 (E.D. La. 1986), asserting that it supported their position. However, counsel for the Dorrieses persuasively countered that the case instead supported their position because the court favorably quoted Gallaugher v. Hebrew Congregation, 35 La.Ann. 829 (1883), which recognized that a judicial mortgage encumbered property the instant it was purchased.

. We note that the “Notarial Act of Correction” attempts to cure all the title problems presented by this confusing chain of events retroactive to November 5, 2014, via the doctrines of after-acquired title, ratification, and acknowledgement. Although not specifically addressed by the parties, this document goes well beyond what is contemplated by La. R.S. 35:2.1, which is designed to address simple clerical errors. What occurred here was not a mere clerical error. In any event, La. R.S. 35:2.1(B) recognizes that acts of correction shall not prejudice the rights acquired by third parties before the act of correction is recorded.